# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2014 Term**

**FILED**

**June 18, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**No. 13-0470**

---

**MANOR CARE, INC.; HCR MANOR CARE SERVICES, INC.;
HEALTH CARE AND RETIREMENT CORPORATION
OF AMERICA, LLC;
HEARTLAND EMPLOYMENT SERVICES, LLC;
JOHN DOES 1 THROUGH 10; AND
UNIDENTIFIED ENTITIES 1 THROUGH 10
(AS TO HEARTLAND OF CHARLESTON),**
Defendants Below, Petitioners

**V.**

**TOM DOUGLAS, INDIVIDUALLY,
AND ON BEHALF OF
THE ESTATE OF DOROTHY DOUGLAS,**
Plaintiffs Below, Respondents

---

**Appeal from the Circuit Court of Kanawha County
Honorable Paul Zakaib, Jr., Judge
Civil Action No. 10-C-952
AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED**

---

**Submitted: March 5, 2014
Filed: June 18, 2014**

Benjamin L. Bailey                    James B. McHugh
Brian A. Glasser                      Michael J. Fuller, Jr.
Bailey & Glasser, LLP                 D. Bryant Chaffin

Charleston, West Virginia
Attorneys for the Petitioners

Thomas J. Hurney, Jr.
Alyssa E. Baute
Jackson Kelly PLLC
Charleston, West Virginia
Attorneys for Amici Curiae,
The West Virginia Hospital Association
and The West Virginia Health Care
Association

Amy J. Quezon
A. Lance Reins
McHugh Fuller Law Group, LLC
Hattiesburgh, Mississippi
Paul T. Farrell, Jr.
Greene, Ketchum, Bailey, Farrell & Tweel
Huntington, West Virginia
Attorneys for the Respondents

Anthony J. Majestro
Powell & Majestro, PLLC
Charleston, West Virginia
Attorney for Amicus Curiae,
West Virginia Association for Justice

CHIEF JUSTICE DAVIS delivered the Opinion of the Court.

JUSTICE KETCHUM deeming himself disqualified, did not participate in the decision of this case.

ALAN D. MOATS, JUDGE, sitting by temporary assignment.

JUSTICE WORKMAN concurs and reserves the right to file a concurring opinion.

JUSTICE BENJAMIN concurs in part and dissents in part and reserves the right to file a separate opinion.

JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.      "The West Virginia Medical Professional Liability Act, codified at W. Va. Code § 55-7B-1 *et seq*., applies only to claims resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient.  It does not apply to other claims that may be contemporaneous to or related to the alleged act of medical professional liability."  Syllabus point 3, *Boggs v. Camden-Clark Memorial Hospital Corp*., 216 W. Va. 656, 609 S.E.2d 917 (2004).

2.      "This Court's opinion in *Boggs v. Camden-Clark Memorial Hospital Corp*., 216 W. Va. 656, 609 S.E.2d 917 (2004), is clarified by recognizing that the West Virginia Legislature's definition of medical professional liability, found in West Virginia Code § 55-7B-2(i) (2003) (Supp.2005), includes liability for damages resulting from the death or injury of a person for *any* tort based upon health care services rendered or which should have been rendered.  To the extent that *Boggs* suggested otherwise, it is modified." Syllabus point 4,*Gray v. Mena*, 218 W. Va. 564, 625 S.E.2d 326 (2005).

3.      While the applicability of the Medical Professional Liability Act, W. Va. Code § 55-7B-1 *et seq.*, is based upon the facts of a given case, the determination of whether

i

a particular cause of action is governed by the Act is a legal question to be decided by the trial court.

4.    "When this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), and its progeny.  If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993)]."  Syllabus point 6, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

5.    "In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous."  Syllabus point 4, *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895).

6.     "When a trial or appellate court reviews an award of punitive damages for excessiveness under Syllabus points 3 and 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), the court should first determine whether the amount of the punitive damages award is justified by aggravating evidence including, but not limited to: (1) the reprehensibility of the defendant's conduct; (2) whether the defendant profited from the wrongful conduct; (3) the financial position of the defendant; (4) the appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed; and (5) the cost of litigation to the plaintiff. The court should then consider whether a reduction in the amount of the punitive damages should be permitted due to mitigating evidence including, but not limited to: (1) whether the punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (2) whether punitive damages bear a reasonable relationship to compensatory damages; (3) the cost of litigation to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence." Syllabus point 7, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

7.     "The outer limit of the ratio of punitive damages to compensatory

iii

damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is *roughly* 5 to 1.  However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional." Syllabus point 15, *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993).

8.     Whether the ratio of punitive damages to compensatory damages is constitutional must be examined on a case-by-case basis.

9.     "A punitive damages award that is not constitutionally excessive under *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992), may nevertheless be reduced by a reviewing court when, in the discretion of the court, a reduction is warranted by mitigating evidence."  Syllabus point 8, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

10.     "When a court grants a remittitur, the plaintiff must be given the option of either accepting the reduction in the verdict or electing a new trial."  Syllabus point 9, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

**Davis, Chief Justice:**

This action against several corporate entities who operate Heartland Nursing Home in Charleston, West Virginia (hereinafter collectively referred to as "MC Companies"),[1] involves claims of negligence; violations of the West Virginia Nursing Home Act, W. Va. Code § 16-5C-1 *et seq.*; and breach of fiduciary duty, arising from injuries to and the death of Ms. Dorothy Douglas, who had been a resident of Heartland Nursing Home. MC Companies appeal the circuit court's denial of their "Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial, or in the Further Alterative for Remittitur" (hereinafter "motion for judgment as a matter of law"), entered following a jury trial that resulted in an award of $11.5 million in compensatory damages and $80 million in punitive damages. MC Companies raise several errors: (1) the verdict form disregarded the distinct corporate forms of the defendants; (2) the verdict form improperly allowed the jury to award damages to non-parties; (3) the circuit court erred in finding the Medical Professional Liability Act (hereinafter "MPLA") did not provide the exclusive remedy for the asserted negligence claims; (4) the circuit court erred in concluding that the Nursing Home Act (hereinafter "NHA") claim is not governed by the MPLA; (5) the circuit court erred in allowing a breach of fiduciary duty claim against a nursing home; and (6) the punitive damages award was improper and excessive. We conclude, based upon the briefs submitted

---

[1]The various companies are identified and described below in our recitation of the factual and procedural history of this action. *See infra* Section I.

1

on appeal, oral arguments, and relevant law, that: (1) MC Companies waived the issue of whether the verdict form disregarded the distinct corporate forms of the defendants; (2) the verdict form did not allow the jury to award damages to non-parties; (3) the MPLA did not provide the exclusive remedy for the asserted negligence claims; (4) the NHA claim is governed by the MPLA and, due to a lack of evidence that the pre-suit requirements of the MPLA were met, this claim is dismissed and the accompanying $1.5 million award is vacated; (5) because the circuit court erred in recognizing a breach of fiduciary duty claim against a nursing home, the claim is dismissed and the accompanying $5 million award is vacated; (6) the punitive damages award is reduced proportionate to the reduction in compensatory damages, and the reduced amount of punitive damges, which equals approximately $32 million, passes constitutional muster. Based upon these conclusions, we affirm, in part; reverse, in part; and remand this action to the circuit court for further proceedings consistent with this opinion.[2]

---

[2]This Court acknowledges the appearance of the following Amici Curiae: The West Virginia Hospital Association and The West Virginia Health Care Association, who filed a joint brief in support of MC Companies; and the West Virginia Association for Justice, who filed a brief in support of Mr. Douglas. We express our appreciation for the participation of these Amici Curiae, and we have considered their positions in our decision of this case.

# I.

## FACTUAL AND PROCEDURAL HISTORY

On September 4, 2009, Dorothy Douglas (hereinafter "Ms. Douglas") was admitted to Heartland Nursing Home in Charleston, West Virginia. Although Ms. Douglas was eighty-seven years old at the time of her admission to Heartland Nursing Home, and she suffered from Alzheimer's dementia, Parkinson's Disease, and other health issues, she was, nevertheless, able to walk with the use of a walker, able to recognize and communicate with her family, well-nourished, and well-hydrated. After spending nineteen days in Heartland Nursing Home, Ms. Douglas had become dehydrated, malnourished, bed ridden, and barely responsive. In addition, she had fallen numerous times, sustained head trauma and bruises, and suffered from sores in her mouth and throat that required the scraping away of dead tissue and debris. Following her nineteen-day stay at Heartland Nursing Home, Ms. Douglas was transferred to another nursing facility, then to Cabell Huntington Hospital,[3] and ultimately to a Hospice care facility where she passed away eighteen days after leaving

---

[3]According to the record, when Ms. Douglas was admitted to Cabell Huntington Hospital, she was suffering from severe dehydration and was totally unresponsive. She was administered IV fluids, which restored her to a normal level of hydration, but she remained largely unresponsive. The use of an NG tube temporarily, or a PEG tube more permanently, to administer nourishment to Ms. Douglas was discussed with her family. The family did not believe these treatments were something Ms. Douglas would want; therefore, they declined these procedures. According to the testifying physician, an NG tube is a nasogastric tube that goes down through the nose into the stomach. It can be used only temporarily because it will cause the nasal passage to erode. A PEG tube is a percutaneous endogastric tube which goes through the abdominal wall into the stomach.

Heartland Nursing Home. According to her treating physician at Cabell Huntington Hospital, Ms. Douglas died as a result of severe dehydration.

Evidence presented at trial demonstrated that Heartland Nursing Home had been chronically understaffed. There had been numerous complaints from residents and their families, as well as by Heartland Nursing Home employees. At least one employee who complained of understaffing was reprimanded for her complaint, and the complaint was apparently removed from Heartland Nursing Home records. Additionally, and notwithstanding attempts to conceal the understaffing, surveys by the West Virginia Department of Health and Human Services documented Heartland Nursing Home's understaffing and improper records pertaining to staff that occurred prior to Ms. Douglas' admission to that facility. Nevertheless, Heartland Nursing Home remained understaffed and, as a result, Ms. Douglas did not survive the adverse effects of her stay there.

Ms. Douglas' son, Tom Douglas, individually and on behalf of the estate of his mother (hereinafter "Mr. Douglas"), filed suit against various corporate entities related to Heartland: Manor Care, Inc.; HCR Manor Care Services, Inc.; Health Care and Retirement Corporation of America, LLC; and Heartland Employment Services, LLC. Manor Care, Inc.,

4

is a holding company that owns the stock of the other named businesses.[4] HCR Manor Care Services, Inc., was the management company.[5] Health Care and Retirement Corporation of America, LLC, owned skilled nursing facilities and other health care facilities such as assisted living and hospice facilities[6]; this corporate entity apparently also held the operating licenses for Heartland Nursing Home and other nursing homes it owned.[7] Heartland Employment Services, LLC.,[8] employed the workers, including administrators and regional directors, who were then leased to Health Care and Retirement Corporation of America, LLC.[9]

Mr. Douglas asserted causes of action including negligence under the MPLA,[10]

---

[4]Kathryn S. Hoops, Vice-President, Director of Tax, Internal Audit, and Risk Management for HCR Manor Care Services, Inc., testified by deposition that Manor Care, Inc., owed and controlled its subsidiaries.

[5]HCR Manor Care Services, Inc., is a subsidiary of Manor Care, Inc.

[6]Health Care and Retirement Corporation of America, LLC, had no employees, itself, but leased its employees from Heartland Employment Services, LLC.

[7]In MC Companies' motion for summary judgment, they described Health Care and Retirement Corporation of America, LLC, as "the licensed nursing home operator that operates the Heartland of Charleston facility," and as "a subsidiary of Manor Care, Inc."

[8]Heartland Employment Services, LLC, also is a subsidiary of Manor Care, Inc.

[9]Only two of these companies had employees: Heartland Employment Services, LLC, and HCR Manor Care Services, Inc.

[10]*See* W. Va. Code § 55-7B-1 *et seq.*

violations of the NHA,[11] an alleged breach of fiduciary duty, and corporate negligence. Following a ten-day trial, the jury returned a verdict in favor of Mr. Douglas in the amount of $11.5 million in compensatory damages[12] and $80 million in punitive damages. MC Companies then filed a motion for judgment as a matter of law, which the circuit court denied. This appeal followed.

## II.

## STANDARD OF REVIEW

MC Companies allege numerous errors in support of their appeal from the trial court's denial of their post-verdict motion for judgment as a matter of law. Specific standards of review for some issues are set out in connection with the particular issues to which they pertain. Generally, however, we are guided by the following principles: "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). Moreover,

> [w]hen this Court reviews a trial court's order granting or

---

[11]*See* W. Va. Code § 16-5C-1 *et seq.*

[12]Specifically, the jury awarded $1.5 million for violations of the NHA resulting in injuries to Ms. Douglas, $5 million for negligence resulting in Ms. Douglas' death, 80% of which was which designated for ordinary negligence and 20% for medical negligence, and $5 million for breach of fiduciary duty resulting in injuries to Ms. Douglas.

denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. pt. 2, *id.* With respect to the circuit court's ruling on a motion for a new trial, our general standard of review is stated thusly:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

With appropriate consideration for these standards, we will address the issues herein raised.

## III.

## DISCUSSION

MC Companies have raised numerous issues involving the verdict form, the

application of the MPLA to this action, the application of the NHA to this case, whether the claim for breach of fiduciary duty is recognized in West Virginia, and the propriety of the punitive damages awarded. We address each of these issues in turn.

### A. Verdict Form

We address two errors asserted by MC Companies related to the verdict form: (1) that it deprived them of individual determinations of punitive damages and (2) that it enabled the jury to award damages to non-parties.[13] Discussion of each of these assigned errors is set out separately after a statement of the general standard for our review of these issues.

**1.** **Standard of Review**. "Generally, this Court will apply an abuse of discretion standard when reviewing a trial court's decision regarding a verdict form." Syl. pt. 4, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010). Likewise, "[a]s a general rule, a trial court has considerable discretion in determining whether to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute." Syl. pt. 8, *Barefoot v. Sundale Nursing Home*, 193 W. Va. 475, 457 S.E.2d 152

---

[13]MC Companies also have argued that the verdict form allowed duplicative damages. Because our resolution of other issues raised in this appeal results in the dismissal of two of the causes of action, it is not necessary for us to address this issue. *See infra* Section III.C, which dismisses Mr. Douglas' Nursing Home Act claim, and Section III.D, which dismisses Mr. Douglas' claim for breach of fiduciary duty.

(1995).

> "[T]he criterion for determining whether the discretion is abused is whether the verdict form, together with any instruction relating to it, allows the jury to render a verdict on the issues framed consistent with the law, with the evidence, and with the jury's own convictions. *See* 9A Charles Allan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2508 (1995); *Martin v. Gulf States Utilities Co.*, 344 F.2d 34 (5th Cir. 1965); and *McDonnell v. Timmerman*, 269 F.2d 54 (8th Cir. 1959)."

*Williams v. Charleston Area Med. Ctr., Inc*., 215 W. Va. 15, 19, 592 S.E.2d 794, 798 (2003) (quoting *Adkins v. Foster*, 195 W. Va. 566, 572, 466 S.E.2d 417, 423 (1995) (per curiam)).

2.      **Separate Determination of Punitive Damages.**  Before this Court, MC Companies assert that the verdict form disregarded the fact that they are distinct corporate entities and deprived each of its right to a separate determination of punitive damages.  They complain that this action was brought against four separate corporations with individual corporate identities and responsibilities, yet the verdict form improperly lumped them into a single unit, *i.e*., "the defendants," against whom the jury was asked to assess punitive damages.  MC Companies concede that they are related corporations, but claim that they remain separate entities.

Mr. Douglas responds that, while MC Companies did object that they were improperly grouped together for determining whether they would be subject to punitive

9

damages, they ultimately withdrew their request to avoid having a separate determination of the amount of any punitive damages awarded. He additionally argues that MC Companies waived the issue by failing to proffer an instruction informing the jury that it could determine liability and allocate damages as to each defendant separately.

The facts pertinent to resolving this issue are that Mr. Douglas and MC Companies each submitted their proposed jury verdict form to the circuit court. During the jury charge conference, MC Companies objected to Mr. Douglas' proposed verdict form and requested that the form contain a question for each defendant asking whether the defendant's conduct was egregious enough to warrant punitive damages. However, MC Companies did not want separate lines upon which the jury could indicate the amount of punitive damages assessed for each defendant. Instead, MC Companies wanted only one line upon which the jury could insert one number representing the aggregate amount of punitive damages assessed against all of the defendants collectively.

The circuit court ruled that if the question of whether a defendant's conduct warranted punitive damages was to be set out separately as to each defendant, then a corresponding line upon which the jury could state the amount of punitive damages to be assessed against that defendant also was required. Because MC Companies did not want the jury to potentially enter a separate amount for punitive damages as to each individual

10

defendant, they withdrew their request to have the jury make a specific determination of whether punitive damages were warranted for each defendant individually.

Accordingly, the circuit court adopted Mr. Douglas' verdict form that contained only one question asking the jury whether the MC Companies' collective conduct warranted an award of punitive damages and, in the event that the question was answered affirmatively, a second question allowing the jury to insert one figure representing the total amount of punitive damages to be awarded by the jury. Because MC Companies' withdrew their request to have the jury make a separate determination for each defendant as to whether punitive damages were warranted, the circuit court ultimately found this issue was waived when addressing the same in ruling upon MC Companies' post-trial motion for a directed verdict. We find no abuse of discretion in the circuit court's ruling.

This Court has recognized that "[w]hen there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined." Syl. pt. 8, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). *Accord* Syl. pt. 4, in part, *State v. Lightner*, 205 W. Va. 657, 520 S.E.2d 654 (1999). Similarly, we have stated that "[g]enerally the failure to object constitutes a waiver of the right to raise the matter on appeal." *State v. Asbury*, 187 W. Va. 87, 91, 415 S.E.2d 891, 895 (1992) (per curiam). *See also AIG Domestic*

11

*Claims, Inc. v. Hess Oil Co., Inc.*, 232 W. Va. 145, ___, 751 S.E.2d 31, 41 (2013) ("While this Court admittedly does not approve of the trial court's arbitrary selection of a finite number of jury instructions, we do not further address the imposition of the instructional limitation due to the absence of an objection being raised by the insurance companies on this particular issue." (footnote omitted)); *State v. White*, 231 W. Va. 270, ___, 744 S.E.2d 668, 678 (2013) (per curiam) (concluding that petitioner's failure to object to jury charge constituted waiver).

Although MC Companies did initially object to the verdict form on the grounds that it did not require the jury to decide, separately, whether each defendant's conduct warranted punitive damages, they withdrew their objection after learning that the circuit court would require a corresponding line for each separate defendant upon which the jury could insert the amount of any punitive damage award granted against that particular defendant. Because MC Companies withdrew their objection, the circuit court correctly determined that the issue had been waived. In fact, by withdrawing their objection, it would appear that MC Companies invited error, which further precludes appellate review of the merits of this issue.

> "Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous [ruling] and then later seeking to profit from that error. The idea of invited error is . . . to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a

12

later stage of the trial use the error to set aside its immediate and adverse consequences.

*State v. Crabtree*, 198 W. Va. 620, 627, 482 S.E.2d 605, 612 (1996). *See also* Syl. pt. 1, *Maples v. West Virginia Dep't of Commerce*, 197 W. Va. 318, 475 S.E.2d 410 (1996) ("A litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal."); *In re Tiffany Marie S.*, 196 W. Va. 223, 233, 470 S.E.2d 177, 187 (1996) ( "[W]e regularly turn a deaf ear to error that was invited by the complaining party." (citation omitted)); *Shamblin v. Nationwide Mut. Ins. Co.*, 183 W. Va. 585, 599, 396 S.E.2d 766, 780 (1990) (finding "the appellant cannot benefit from the consequences of error it invited").

To conclude, we find the circuit did not abuse its discretion in finding that MC Companies waived the issue of whether the verdict form should have required the jury to separately assess whether each defendant's conduct warranted an award of punitive damages.[14]

---

[14]MC Companies additionally argue to this Court that they also were improperly grouped together on the verdict form for the jury's determination of liability and compensatory damages, and that this defect violated the requirement of the MPLA that the jury make findings as to the percentage of fault attributable to each defendant. *See* W. Va. Code § 55-7B-9(a)(5) (2003) (Repl. Vol. 2008). Because MC Companies failed to raise these issues to the trial court prior to the jury returning its verdict and being discharged, they also were waived. *Cf.* Syl. pt. 2, *Combs v. Hahn*, 205 W. Va. 102, 516 S.E.2d 506 (1999) ("Absent extenuating circumstances, the failure to timely object to a defect or irregularity in the verdict form when the jury returns the verdict and prior to the jury's discharge, constitutes
(continued...)

**3.      Whether the verdict form enabled the jury to award damages to**

**non-parties.**  MC Companies argue that under the West Virginia wrongful death statute, the

only real party in interest is the personal representative of the decedent.  Accordingly, MC

Companies contend, the only proper plaintiff in this case was the Estate of Dorothy Douglas.

Therefore, the circuit court erred in adopting a verdict form that allowed the jury to award

damages to Ms. Douglas' children, Tom Douglas and Carolyn Douglas Hoy.  MC Companies

contrast the verdict form to the jury instructions, which stated that the Estate was to receive

all of the damages.

Mr. Douglas disagrees with MC Companies' assertion that awarding wrongful

death proceeds directly to the wrongful death beneficiaries was legally wrong.  Mr. Douglas

submits that, while the personal representative of the deceased in a wrongful death suit must

bring the suit, the personal representative is merely a nominal party and any recovery passes

to the beneficiaries designated in the wrongful death statute and not to the decedent's estate.

Before conducting our analysis of this issue, we briefly review the relevant

facts.  After asking the jury to determine whether there was negligence on the part of MC

Companies that caused the death of Ms. Douglas and to portion that negligence between

---

[14](...continued)
a waiver of the defect or irregularity in the verdict form.").

14

ordinary negligence and medical negligence,[15] the verdict form next asked the jury to determine the amount of the damages as follows:[16]

> 5.     What amount of compensatory damages do you find Defendants must pay to Dorothy Douglas' children, Tom Douglas and Carolyn A. Douglas Hoy, for their sorrow, mental anguish, and solace which may include society, companionship, and comfort, individually?
>
> Tom Douglas and Carolyn A. Douglas Hoy  $_____

In denying MC Companies' motion for judgment as a matter of law, the circuit court found

> that the verdict form did not allow the jury to improperly award damages to non-parties, Tom Douglas and Carolyn A. Douglas Hoy. . . . While the real party in interest is the personal representative of the deceased in a wrongful death action, the damages are not awarded to the estate as asserted by the Defendants but directly to the beneficiaries of the decedent.

The circuit court based its decision upon the language of W. Va. Code § 55-7-6 (1992) (Repl. Vol. 2008).  We agree and therefore find no error.

W. Va. Code § 55-7-6(a) states, in relevant part, that

> [e]very such action [for wrongful death] shall be brought by and in the name of the personal representative of such

---

[15]The jury allocated 80% to ordinary negligence and 20% to medical negligence.

[16]The jury awarded $5 million in compensatory damages.

15

deceased person who has been duly appointed in this State, or in any other state, territory or district of the United States, or in any foreign country, and the amount recovered in every such action shall be recovered by said personal representative and be distributed in accordance herewith.

In addition, the relevant portion of W. Va. Code § 55-7-6(b) states that "[i]n every such action for wrongful death, the jury . . . may award such damages as to it may seem fair and just, and, *may direct in what proportions the damages shall be distributed to the surviving . . . children. . . .*"  (Emphasis added).

In light of the foregoing language, this Court has observed that, "'[i]t cannot be questioned that a wrongful death action . . . must be brought by the personal representative of a decedent's estate.'" *Richardson v. Kennedy*, 197 W. Va. 326, 332, 475 S.E.2d 418, 424 (1996) (quoting *Trail v. Hawley*, 163 W. Va. 626, 628, 259 S.E.2d 423, 425 (1979)). Nevertheless, we also have recognized that,

> in a wrongful death case, the personal representative is merely a nominal party, and any recovery passes directly to the beneficiaries designated in the wrongful death statute, and not to the decedent's estate. Syllabus Point 4, *McClure v. McClure*, 184 W. Va. 649, 403 S.E.2d 197 (1991). *See also Dunsmore v. Hartman*, 140 W. Va. 357, 361-62, 84 S.E.2d 137, 139-40 (1954); *Peters v. Kanawha Banking & Trust Co.*, 118 W. Va. 484, 488, 191 S.E. 581, 583 (1937).

*Richardson v. Kennedy*, 197 W. Va. at 332, 475 S.E.2d at 424.  *See also Ellis v. Swisher ex rel. Swisher*, 230 W. Va. 646, 650, 741 S.E.2d 871, 875 (2013) (per curiam) ("[W]rongful death recoveries have been determined to exist solely for the benefit of a decedent's

16

beneficiaries."); *Bradshaw v. Soulsby*, 210 W. Va. 682, 687, 558 S.E.2d 681, 686 (2001) ("The essential, beneficial purpose of the wrongful death act is 'to compensate the beneficiaries for the loss they have suffered as a result of the decedent's death.'"); Syl. pt. 4, in part, *Thompson & Lively v. Mann*, 65 W. Va. 648, 64 S.E. 920 (1909) ("Money recovered in an action by an administrator . . . for causing the death of his decedent by wrongful act, neglect, or default, does not constitute general assets of the estate of such decedent in the hands of the administrator to be administered . . . . *Such money belongs to the particular persons who by law are entitled thereto*." (emphasis added)).

This case was properly brought "by and in the name of [Ms. Douglas'] personal representative" as required by W. Va. Code § 55-7-6(b).[17] Thus, the personal representative should have been the party named on the verdict form. Nevertheless, as this

---

[17]MC Companies additionally complain that the circuit court erred in failing to dismiss Tom Douglas as a plaintiff in his individual capacity. Insofar as Mr. Douglas also brought this suit in his capacity as the representative of Ms. Douglas' estate as required by W. Va. Code § 55-7-6(b), we find any error resulting from him also being named in his individual capacity was harmless. *See* W. Va. R. Civ. P. 61 (stating, in part, that "no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). *See also Lacy v. CSX Transp., Inc.*, 205 W. Va. 630, 643-44, 520 S.E.2d 418, 431-32 (1999) ("Under W. Va. R. Civ. P. 61 '[a] party is entitled to a new trial only if there is a reasonable probability that the jury's verdict was affected or influenced by trial error.' *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 111, 459 S.E.2d 374, 388 (1995)." (footnote omitted)).

Court has made clear, the monetary damages awarded by the jury belong to Ms. Douglas'

beneficiaries. Accordingly, while the naming of Ms. Douglas' beneficiaries on the verdict

form was in error, we find the error to be harmless in that it merely acknowledged that the

monetary recovery would ultimately pass to Ms. Douglas' children, Tom Douglas and

Carolyn A. Douglas Hoy.

### *B. MPLA*

MC Companies argue that the trial court erred in failing to hold that the MPLA

provided the exclusive remedy for the plaintiffs' claims against the defendants. They

contend that the MPLA was designed by the Legislature to apply broadly and specifically to

limit malpractice claims concerning nursing homes, and that the Legislature has recognized

that the MPLA can achieve this purpose only if the statute completely occupies the field of

malpractice claims. MC Companies assert that all of Mr. Douglas' claims fall within the

broad definition of "medical professional liability" because they are all based upon "health

care services" that were "rendered, or which should have been rendered." W. Va. Code § 55-

7B-2(i) (2006) (Repl. Vol. 2008). *See also* W. Va. Code § 55-7B-2(e) (defining "Health

care" as "any act or treatment performed or furnished, or which should have been performed

or furnished, by any health care provider for, to or on behalf of a patient during the patient's

medical care, treatment or confinement").

18

Mr. Douglas responds that causes of action for both ordinary negligence and medical malpractice can be asserted by a plaintiff, and the MPLA applies to only the portion of the compensatory verdict determined by the jury to arise out of health care services provided by a health care provider. Mr. Douglas asserts that he pled medical malpractice and corporate negligence and presented evidence on both theories. The jury then determined what percentage of negligence was related to health care services and what percentage was not. As to the non-medical corporate defendants, Mr. Douglas asserts that he alleged direct liability for the decisions they made that had a direct impact on the harm suffered by Ms. Douglas. Mr. Douglas insists that he did not proceed against any of the corporate defendants on the basis of vicarious liability. He submits that there was ample evidence presented at trial, and specific findings made by the trial court, as to how non-healthcare decisions, such as budgetary constraints, lack of staff, and poor management of the facility, affected all of the residents, including Ms. Douglas.

We begin our analysis with the recognition that the MPLA governs "medical professional liability"[18] actions against "health care provider[s]"[19] and provides the exclusive

---

[18]The MPLA defines "Medical professional liability" as "any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient." W. Va. Code § 55–7B–2(i) (2006) (Repl. Vol. 2008).

[19]The MPLA defines "Health care provider"

(continued...)

remedy for such actions. *See, e.g.,* W. Va. Code § 55-7B-6 (2001) (Repl. Vol. 2008) (stating, in relevant part, that "no person may file a medical professional liability action against any health care provider without complying with the provisions of this section"). Notably, this Court previously has considered the exclusiveness of the MPLA. We first addressed this issue in *Boggs v. Camden-Clark Memorial Hospital Corp.*, 216 W. Va. 656, 609 S.E.2d 917 (2004), where the plaintiff alleged medical professional liability and also alleged non-medical claims related to an asserted cover-up of medical negligence. The *Boggs* Court concluded that only the medical professional liability claims were subject to the MPLA and held that

> [t]he West Virginia Medical Professional Liability Act, codified at W. Va. Code § 55-7B-1 *et seq.*, applies only to claims resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It does not apply to other claims that may be contemporaneous to or related to the alleged act of

---

[19](...continued)
     as a person, partnership, corporation, professional limited liability company, health care facility or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, psychologist, emergency medical services authority or agency, or an officer, employee or agent thereof acting in the course and scope of such officer's, employee's or agent's employment.

W. Va. Code § 55-7B-2(g).

medical professional liability.

Syl. pt. 3, *Boggs*, 216 W. Va. 656, 609 S.E.2d 917. The facts in *Boggs* were that Ms. Boggs, the plaintiff's decedent, entered the hospital for ankle surgery. Following the administration of a spinal anesthetic in preparation for the surgery, she suffered a cardiac arrest and died several days later. The administrator of her estate filed suit alleging that the anesthesiologist failed to adhere to the standard of care. Claims were also asserted against the anesthesiology group and hospital on theories of negligent hiring and retention, and vicarious liability. Finally,

> [a]ccording to [Ms. Boggs' estate], following the death of Ms. Boggs, several parties engaged in a cover-up, which led Mr. Boggs to assert additional claims for fraud, the destruction of records, the tort of outrage, and the spoliation of evidence. Mr. Boggs maintains that these claims should be considered to be separate and distinct from his medical malpractice claims.

*Boggs*, 216 W. Va. at 659, 609 S.E.2d at 920. In reaching the holding announced in Syllabus point 3 of the opinion, the Court reasoned that

> [f]raud, spoliation of evidence, or negligent hiring are no more related to "medical professional liability" or "health care services" than battery, larceny, or libel. There is simply no way to apply the MPLA to such claims. The Legislature has granted special protection to medical professionals, while they are acting as such. This protection does not extend to intentional torts or acts outside the scope of "health care services." If for some reason a doctor or nurse intentionally assaulted a patient, stole their possessions, or defamed them, such actions would not require application of the MPLA any more than if the doctor or nurse committed such acts outside of the health care context. Moreover, application of the MPLA to non-medical malpractice claims would be a logistical impossibility. No reputable

21

physician would sign a certificate of merit for a claim of fraud or larceny or battery; how could such a certificate be helpful or meaningful?

*Boggs*, 216 W. Va. at 662-63, 609 S.E.2d at 923-24. Thus, *Boggs* stands for the proposition that some claims that may be brought against a health care provider simply do not involve health care services and, therefore, are not subject to the MPLA. This Court has not deviated from this conclusion.

Following *Boggs*, this Court decided *Gray v. Mena*, 218 W. Va. 564, 625 S.E.2d 326 (2005). In *Gray*, the Court expressed concern that certain language in the *Boggs* opinion might be misconstrued to mean that no intentional acts would fall within the MPLA. To foreclose such a misinterpretation of *Boggs*, the *Gray* Court held that

> [t]his Court's opinion in *Boggs v. Camden-Clark Memorial Hospital Corp.*, 216 W. Va. 656, 609 S.E.2d 917 (2004), is clarified by recognizing that the West Virginia Legislature's definition of medical professional liability, found in West Virginia Code § 55-7B-2(i) (2003) (Supp.2005), includes liability for damages resulting from the death or injury of a person for *any* tort based upon health care services rendered or which should have been rendered. To the extent that *Boggs* suggested otherwise, it is modified.

Syl. pt. 4, *Gray*, 218 W. Va. 564, 625 S.E.2d 326.[20] Thus, *Gray* did not change the Court's

_____

[20]Factually, *Gray* involved a claim that an assault had occurred during the course of a medical examination by a physician. The circuit court dismissed the action based upon the plaintiff's failure to comply with the pre-suit requirements of the MPLA. This Court observed that,

(continued...)

22

interpretation of the MPLA, first announced in *Boggs*, that the MPLA applies only to actions

"*based upon health care services* rendered or which should have been rendered." *Id.*

(emphasis added). *See also* Syl. pt. 3, in part, *Boggs*, 216 W. Va. 656, 609 S.E.2d 917

(stating that the MPLA "applies only to claims resulting from the death or injury of a person

for any tort or breach of contract *based on health care services rendered*, or which should

have been rendered, by a health care provider or health care facility to a patient" (emphasis

added)). Indeed,

> [i]t has been correctly observed that "[t]he fact that the alleged misconduct occurs in a healthcare facility does not, by itself, make the claim one for malpractice. Nor does the fact that the injured party was a patient at the facility or of the provider, create such a claim." *Madison Ctr., Inc. v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App.2006). *See also Atlanta Women's Health Group v. Clemons*, 287 Ga. App. 426, 651 S.E.2d 762 (2007) ("Of course, not every suit which calls into

---

[20](...continued)
in the case sub judice, a good faith argument may be made that a claim of assault and battery is clearly a claim of an intentional tort which did not involve health care services rendered or which should have been rendered. Similarly, we recognize that a good faith argument may be made that because the alleged assault and battery occurred in the course of an ostensible medical examination, the Appellant's claim is subject to the pre-suit requirements at issue.

*Gray v. Mena*, 218 W. Va. 564, 568-69, 625 S.E.2d 326, 330-31 (2005). Ultimately the Court concluded that, "under the particular circumstances of this case, dismissal appears to be a disproportionately harsh sanction," particularly in light of the newness of the MPLA at that time. *Gray*, 218 W. Va. at 570, 625 S.E.2d at 332. Accordingly, the Court remanded for reinstatement of the action and to allow the defendants to request compliance with the MPLA.

question the conduct of one who happens to be a medical professional is a medical malpractice action. We must look to the substance of an action against a medical professional in determining whether the action is one for professional or simple negligence."); *Perkins v. Susan B. Allen Mem'l Hosp.*, 36 Kan. App. 2d 885, 146 P.3d 1102, 1107 (2006) ("Not every claim for negligence against a healthcare provider constitutes malpractice."); *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005) ("Cases involving health or medical entities do not automatically fall within the medical malpractice statute."). Thus, "when the complaint does not allege negligence in furnishing medical treatment to a patient, but rather the failure of a medical provider in fulfilling a different duty, the claim sounds in negligence." *Rodriguez v. Saal*, 43 A.D.3d 272, 841 N.Y.S.2d 232, 235 (2007).

*Riggs v. West Virginia Univ. Hosps., Inc.*, 221 W. Va. 646, 665-66, 656 S.E.2d 91, 110-11 (2007) (per curiam) (Davis, C.J., concurring).[21]  *See also R.K. v. St. Mary's Med. Ctr., Inc.*,

---

[21]*Riggs* was resolved in a manner that did not require the Court to determine whether the claims asserted were subject to the MPLA. However, the concurring opinion opined that

> [t]he facts in the instant case demonstrate that at the time Ms. Riggs was having knee surgery, WVUH exposed all of its patients, and possibly anyone entering the hospital, to the potential of contracting a serratia bacterial infection. The potential for contracting a serratia bacterial infection was not the reason Ms. Riggs was admitted to the hospital. Ms. Riggs sought medical treatment for her right knee. The duty breached by WVUH was not that of failing to properly treat Ms. Riggs' knee, WVUH breached a general duty it owed to all patients and nonpatients to maintain a safe environment. *See Padney v. MetroHealth Med. Ctr.*, 145 Ohio App.3d 759, 764 N.E.2d 492 (2001) (allowing estate of deceased hospital worker to bring common law tort actions against hospital on theory that hospital failed to employ adequate controls to prevent transmission of

(continued...)

24

229 W. Va. 712, 723, 735 S.E.2d 715, 726 (2012) (concluding that "the allegations asserted in the instant case, which pertain to the improper disclosure of medical records, [do] not fall within the MPLA's definition of 'health care,' and, therefore, the MPLA does not apply").

We have cautioned, however, that the manner in which a claim is pled does not govern whether the MPLA ultimately will be applied to a particular claim. This Court has held that

> [t]he failure to plead a claim as governed by the Medical Professional Liability Act, W. Va. Code § 55–7B–1, *et seq.*, does not preclude application of the Act. Where the alleged tortious acts or omissions are committed by a health care provider within the context of the rendering of "health care" as defined by W. Va. Code § 55–7B–2(e) (2006) (Supp.2007), the Act applies regardless of how the claims have been pled.

Syl. pt. 4, *Blankenship v. Ethicon, Inc.*, 221 W. Va. 700, 656 S.E.2d 451 (2007). *But see Riggs v. West Virginia Univ. Hosps., Inc.*, 221 W. Va. at 647-48, 656 S.E.2d at 92-93 (concluding that judicial estoppel prevented plaintiff who "pled, prosecuted and tried their claims against [the defendant hospital] as claims subject to the provisions of the MPLA" from changing "the theory of their case after the return of jury's verdict so as to avoid

---

[21](...continued)
tuberculosis to its employees). Breach of the duty by a hospital to maintain a safe environment, which breach causes injury to a patient or nonpatient, simply does not fall under the MPLA.

*Riggs v. West Virginia Univ. Hosps., Inc.*, 221 W. Va. 646, 666, 656 S.E.2d 91, 111 (2007) (per curiam) (Davis, C.J., concurring).

25

application of the MPLA's non-economic damages cap"). Rather, this Court has twice recognized that the decision of whether the MPLA applies to certain claims presents a fact-driven query. *See Blankenship*, 221 W. Va. at 706, 656 S.E.2d at 457 ("[T]he determination of whether the Medical Professional Liability Act, W. Va. Code § 55–7B–1 *et seq.*, applies to certain claims is a fact-driven question[.]"); *Gray v. Mena*, 218 W. Va. at 570, 625 S.E.2d at 332 ("[W]here the allegedly offensive action was committed within the context of the rendering of medical services, the [MPLA] applies. Where, however, the action in question was outside the realm of the provision of medical services, the [MPLA] does not apply."). We have clarified, however, and we now expressly hold that, "while the applicability of the [Medical Professional Liability Act, W. Va. Code § 55-7B-1 *et seq.*,] is based upon the facts of a given case, the determination of whether a particular cause of action is governed by the [Act] is a legal question to be decided by the trial court." *Blankenship*, 221 W. Va. at 706 n.12, 656 S.E.2d at 457 n.12.

In the instant case, the circuit court implicitly found that some of Mr. Douglas' claims were governed by the MPLA while some were not. This determination by the circuit court is demonstrated by the court's adoption of a verdict form that allowed the jury to allocate its negligence award between ordinary negligence and medical negligence. Thus, this Court's task is to determine whether the circuit court's decision in this regard was correct. We find that it was.

26

Mr. Douglas asserted claims that are not related to medical professional liability. In other words, they are not claims "based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient." Syl. pt. 3, in part, *Boggs*, 216 W. Va. 656, 609 S.E.2d 917. In this regard, the plaintiffs alleged corporate negligence based upon the failure to allocate a proper budget to Heartland Nursing Home to allow it to function properly, including maintaining adequate numbers of staff to care for its residents. To support these allegations, Mr. Douglas presented the testimony of certified nursing assistants (CNAs)[22] and a licensed practical nurse who had worked at Heartland and stated that the facility was nearly always understaffed. These witnesses described the conditions as "horrible" and "unbearable" due to the low numbers of staff available to care for residents of the nursing home. At least one former worker testified that the only time there was close to a sufficient amount of staff at the facility was when it was being inspected by the State. There was also testimony by the human relations director for Heartland Nursing Home during the year 2009. She stated that the CNA turnover rate for that year was 112.3%, and the primary reason given by the CNAs for leaving their employment with Heartland Nursing Home was that the facility was understaffed. They also complained of being overworked and underpaid. Requests for additional staff at Heartland Nursing Home were denied by the regional director of

[22]CNAs typically provided the care related to daily living, such as personal hygiene, moving patients to avoid bed sores, and assisting the patients with eating.

27

operations for Heartland Employment Services, LLC.

Although the problem of understaffing was known by virtue of requests for salary increases, requests for additional use of agency CNAs, and a survey issued by the West Virginia Department of Health and Human Services that documented the presence of an inadequate staff at Heartland Nursing Home prior to Ms. Douglas' residence there, the issue was not resolved insofar as there was insufficient staff at the facility to properly care for Ms. Douglas during her stay. Finally, Mr. Douglas presented evidence that control of Heartland Nursing Home, both as to budget and staffing, was exercised by companies that did not qualify as health care providers.[23] For example, Heartland Nursing Home's budget was ultimately presented to the chief operating officer for Manor Care, Inc., for approval, and Heartland Nursing Home was expected to comply with the final budget.[24]

Claims related to business decisions, such as proper budgeting and staffing, by

---

[23]Kathryn Hoops, Vice President, Director of Tax, Internal Audit, and Risk Management for HCR Manor Care Services, who was designated by each of the corporate defendants to testify on its behalf, stated that Manor Care, Inc., directly owned and controlled its subsidiaries.

[24]More specifically, the Heartland budget first was reviewed by the Heartland Nursing Home Administrator; it then had to be reviewed and approved by a regional director of operations for Heartland Employment Services. Thereafter, it was reviewed and approved by the General Manager and Vice-President for the Mid-Atlantic Division of Heartland Employment Services. Once all the budgets for the Mid-Atlantic Division were reviewed, they were rolled into a divisional operating budget that was submitted for approval to the chief operating officer for Manor Care, Inc.

entities that do not qualify as Health Care Providers under the MPLA simply do not fall within that statutory scheme. Therefore, the MPLA did not provide the exclusive remedy for Mr. Douglas' negligence claims.

### C. The Nursing Home Act (NHA)

MC Companies also assert that the circuit court erred in concluding that the NHA is not limited by the MPLA, because the MPLA applies to *all* causes of action based on health care services.

Mr. Douglas contends that the MPLA and the NHA can coexist because they provide for different actions. In this regard, Mr. Douglas argues that the language of the NHA indicates that its purpose is to protect nursing home residents that are injured as a result of *any* deprivation of a right or benefit, and, while some of these rights or benefits may fall under the MPLA, others do not. He further asserts that nothing in the MPLA states that it controls to the exclusion of all other statutes that include claims other than medical malpractice claims. Thus, he reasons that certainly some actions that occur within a nursing home do not constitute "healthcare" as defined by the MPLA.

This issue is resolved by application of the version of the Nursing Home Act

in effect when this action was filed.[25]  Our review of the Act is guided by the principle that

"[t]he primary object in construing a statute is to ascertain and give effect to the intent of the

Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219

S.E.2d 361 (1975).  Furthermore, in our effort to give meaning to the relevant statutory

---

[25]Notably, W. Va. Code § 16-5C-15 has been amended.  In the amended version, which became effective on July 1, 2013, the Legislature makes clear that the NHA falls under the MPLA, which is codified at W. Va. Code § 55-7B-1 *et seq*:

> *Nothing in this section or any other section of the code shall limit the protections afforded nursing homes or their health care providers under article seven-b [§ 55-7B-1 et seq.], chapter fifty-five of this code.  Nursing homes and their health care providers shall be treated in the same manner as any other health care facility or health care provider under article seven-b, chapter fifty-five of this code.*  The terms "health care facility" and "health care provider" as used in this subsection shall have the same meaning as set forth in subsections (f) and (g), section two, article seven-b, chapter fifty-five of this code.

W. Va. Code § 16-5C-15 (g) (2013) (Supp. 2013) (emphasis added).  Also in the amendment, the Legislature made clear that the revised statute was not to be used to determine whether the NHA came under the MPLA prior to its 2013 amendments:

> The amendments to this section enacted during the 2013 Regular Session of the Legislature shall be effective July 1, 2013: Provided, *That there shall be no inference, either positive or negative, to any legal action pending pursuant to this section as of July 1, 2013.*  The amendments to this section in 2013 are not in any way intended to modify, change, expand or contract the Medical Professional Liability Act.  The proper construction of this section and the limitations and provisions of article seven-b, chapter fifty-five of this code shall be determined by principles of statutory construction.

W. Va. Code § 16-5C-15 (h) (emphasis added).

language, we are mindful that "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959). Neverthless, "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992).

While the Legislature, by virtue of amendments made in 2013, has now made it abundantly clear that the NHA falls under the MPLA,[26] for the purposes of this case, we must decide whether the pre-amendment version of the NHA was similarly intended to fall within the MPLA. We believe the language of the NHA, as it existed at the time relevant to this matter, evidences an intent on the part of the Legislature to bring it within the MPLA. This intent is demonstrated in the Act's repeated acknowledgment that nursing homes are places providing nursing and/or health care. For example, at the outset, the Act identifies its purpose

> to encourage and promote the development and utilization of resources to ensure the effective and financially efficient *care and treatment of persons who are convalescing* or whose physical or mental condition requires them to receive a degree of *nursing or related health care* greater than that necessary for well individuals.

---

[26]*See supra* note 25.

31

W. Va. Code § 16-5C-1 (1997) (Repl. Vol. 2011) (emphasis added). In addition, the Act

defines a "nursing home" as

> any institution, residence or place, or any part or unit thereof,
> however named, in this state which is advertised, offered,
> maintained or operated by the ownership or management,
> whether for a consideration or not, *for the express or implied
> purpose of providing accommodations and care*, for a period of
> more than twenty-four hours, for four or more *persons who are
> ill or otherwise incapacitated and in need of extensive, ongoing
> nursing care* due to physical or mental impairment or which
> provides services for the rehabilitation of persons who are
> convalescing from illness or incapacitation.

W. Va. Code § 16-5C-2(e) (1997) (Repl. Vol. 2011) (emphasis added). The term "nursing

care" is defined as

> those procedures commonly employed in providing for the
> physical, emotional and rehabilitational needs of the ill or
> otherwise incapacitated *which require technical skills and
> knowledge beyond that which the untrained person possesses*,
> including, but not limited to, such procedures as: Irrigations,
> catheterization, special procedure contributing to rehabilitation,
> and administration of medication by any method which involves
> a level of complexity and skill in administration not possessed
> by the untrained person.

W. Va. Code § 16-5C-2 (f) (emphasis added). Finally, the Act provides that

> [a]ny nursing home that deprives a resident of any right
> or benefit created or established *for the well-being of this
> resident* by the terms of any contract, by any state statute or rule,
> or by any applicable federal statute or regulation, shall be liable
> to the resident for injuries suffered as a result of such
> deprivation.

W. Va. Code § 16-5C-15 (c) (1997) (Repl. Vol. 2011) (emphasis added). The foregoing

provisions plainly establish the Legislature's intent that NHA claims related to the provision of health care services in a nursing home environment are subject to the MPLA.[27] Accordingly, the circuit court erred by concluding that "nothing within the [NHA] . . . provides that it must be controlled . . . by the MPLA."

This does not end our analysis, however, as we must determine the impact of the MPLA on Mr. Douglas' NHA claim. Necessary to the initiation of any claim subject to the MPLA is the service on a health care defendant of a "notice of claim" and "screening certificate of merit" by certified mail at least thirty days prior to filing the action. *See* W. Va. Code § 55–7B–6(a) (2003) (Repl. Vol. 2008) (declaring that "no person may file a medical professional liability action against any health care provider without complying with the provisions of this section"); W. Va. Code § 55–7B–6(b) (requiring notice of claim and screening certificate of merit). *See also State ex rel. Miller v. Stone*, 216 W. Va. 379, 383, 607 S.E.2d 485, 489 (2004) (per curiam) ("A proper reading of W. Va. Code § 55–7B–6(b), indicates that 30 days before a plaintiff files a medical malpractice action, he or she must serve a notice of claim on the defendant. This notice of claim is to include two things—(1)

---

[27]We recognize that the NHA further authorizes claims that are not related to the provision of health care and that, therefore, would not be subject to the MPLA. In this case, however, the verdict form failed to allow the jury to apportion the compensatory damages awarded under the NHA between heath care related and non-health care related claims. Accordingly, we are unable to make any judgment as to what portion, if any, of the NHA award was for non-health care related damages.

a statement of the theory or theories of liability upon which a cause of action may be based; and (2) a screening certificate of merit.").

In this case, we find nothing in the appellate record to indicate that the requirements of W. Va. Code § 55–7B–6(b) were met with regard to Mr. Douglas' NHA claim. Because MC Companies argued below that Mr. Douglas' NHA claim fell within the MPLA, Mr. Douglas was on notice of the possibility that a court may agree. Accordingly, it was incumbent upon Mr. Douglas to comply with the MPLA. *See Gray*, 218 W. Va. at 571, 625 S.E.2d at 333 (stating "[w]e emphasize that . . . we would strongly encourage litigants to err on the side of caution by complying with the requirements of the [MPLA] if any doubt exists . . .").  In addition, Mr. Douglas was required to document such compliance in the appellate record to provide this Court with the opportunity for a thorough review. *See Perrine*, 225 W. Va. at 597, 694 S.E.2d at 930 (per curiam on pet. for reh'g) (denying petition for rehearing based, in part, upon refusal to consider evidence that was available during appeal where record on appeal was not supplemented with such evidence).

Because we are unable to confirm Mr. Douglas' compliance with the pre-suit requirements of the MPLA in connection with his NHA claim, we conclude that his NHA claim must be dismissed. *See Davis v. Mound View Health Care, Inc.*, 220 W. Va. 28, 640 S.E.2d 91 (2006) (finding that circuit court properly dismissed medical malpractice action

against nursing home for failure to comply with pre-suit notice requirements of MPLA); *Gray*, 218 W. Va. at 571, 625 S.E.2d at 333 (declining to dismiss on particular facts presented, but warning that "[w]e cannot, however, assure future litigants who fail to comply with the requirements of the [MPLA] that dismissal can be avoided").

Because we dismiss Mr. Douglas' NHA claim, the portion of the compensatory damages attributed to that claim, which was $1.5 million, is hereby vacated.

### D. Breach of Fiduciary Duty

The jury in this case awarded $5 million for harm to Ms. Douglas that resulted from MC Companies' breach of a fiduciary duty. MC Companies' post-verdict motion for judgment as a matter of law sought to have the circuit court reject this cause of action. In denying their motion, the circuit court opined that

> the Defendants were in a fiduciary relationship with Dorothy Douglas and owed a fiduciary duty to her. According to the Restatement (Second) of Torts § 874, "one standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." According to the comments, a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874, cmt. a. Further, a fiduciary who commits a breach of his duty "is guilty of tortious conduct to the person for whom he should act." *Id.* at cmt. b.
>
> . . . .

35

The Court finds that Dorothy Douglas was a vulnerable adult upon admission to Defendants' facility and in a position where she trusted and depended on the Defendants such that a fiduciary relationship was present. Thus, Defendants owed a duty to Ms. Douglas.

On appeal, MC Companies contend that the circuit court erred by denying their post-verdict motion for judgment as a matter of law as to the claim for breach of fiduciary duty. MC Companies argue that there is no legal or evidentiary support for a breach of fiduciary duty claim under the facts of this case. They suggest that there was no evidence that any defendant undertook a duty to act for the benefit of Ms. Douglas while subordinating its interests to hers. Instead, there was a contractual relationship that obligated one of its entities, Health Care and Retirement Corp. of America, LLC, to provide healthcare services to Ms. Douglas in return for her payment for those services. MC Companies urge this Court to reject Mr. Douglas' invitation to adopt new groundbreaking law establishing that nursing homes owe a fiduciary duty to provide adequate healthcare.

Mr. Douglas responds that one must look at the relationship to determine whether a fiduciary duty exists. Additionally, Mr. Douglas urges that sufficient evidence was presented to support the existence of a fiduciary duty and the defendants' breach of the same.

It is well established that

36

> "[t]he fiduciary duty is '[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person. It is the highest standard of duty implied by law [.]'" *Elmore v. State Farm Mut. Auto. Ins. Co.*, 202 W. Va. 430, 435, 504 S.E.2d 893, 898 (1998) (quoting Black's Law Dictionary 625 (6th ed.1990)).

*Napier v. Compton*, 210 W. Va. 594, 598, 558 S.E.2d 593, 597 (per curiam) (2001). *See also*

*McKinley v. Lynch*, 58 W. Va. 44, 57, 51 S.E. 4, 9 (1905) (observing that a fiduciary

relationship exists "whenever a trust, continuous or temporary, is specially reposed in the

skill or integrity of another"). Furthermore, this Court has explained that,

> "[a]s a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." 36A C.J.S. Fiduciary, p. 385 (1961).

*Elmore v. State Farm Mut. Auto. Ins. Co.*, 202 W. Va. 430, 436, 504 S.E.2d 893, 899 (1998).

This Court has not previously recognized a cause of action for breach of

fiduciary duty against a nursing home. In other words, we have not ruled that a nursing home

owes a fiduciary duty to its residents or what the parameters of such a duty would be. Based

upon the particular facts of the instant matter, and the small number of jurisdictions who have

expressly recognized such a cause of action,[28] we decline Mr. Douglas' invitation to

---

[28]*See, e.g.*, *Petre v. Living Ctrs.-East, Inc.*, 935 F. Supp. 808, 812 (E.D. La. 1996) ("While this Court concedes that fiduciary relationships are most often found in financial dealings, the Court can think of no relationship which better fits the above

(continued...)

37

recognize such a cause of action at this time. *See, e.g., Howard v. Estate of Harper ex rel. Harper,* 947 So. 2d 854, 861-62 (Miss. 2006) ("'If the Court were to find a fiduciary relationship between Plaintiff and [the nursing home licensee and administrators], then a reasonable inference could be made that each and every employee of [the nursing home], from the janitorial staff who cleaned Plaintiff's room to the chief executive officer who established policies and procedures for [the nursing home], owed a fiduciary duty to the Plaintiff. The [nursing home licensee and administrators] were primarily responsible for the management of [the nursing home], a responsibility that typically does not create a fiduciary duty.'" (quoting *Gray v. Beverly Enters.-Miss., Inc.*, 261 F. Supp. 2d 652, 662-63 (S.D. Miss. 2003), *rev'd on other grounds,* 390 F.3d 400 (5th Cir. 2004)). Accordingly, we conclude that the circuit court erred in recognizing a cause of action for breach of fiduciary duty against a nursing home, and we dismiss this cause of action.

Because we dismiss Mr. Douglas' claim for breach of fiduciary duty, the

---

[28](...continued)
description than that which exists between a nursing home and its residents."); *Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. Dist. Ct. App. 1997) (concluding that "[s]ince [the plaintiff] properly alleged a fiduciary duty between Manor Care and it residents, which arose out of a special relationship independent of the contract, and a breach of same, it was error for the trial court to dismiss [plaintiff's breach of fiduciary duty claim]"); *Zaborowski v. Hospitality Care Ctr. of Hermitage, Inc.*, 60 Pa. D. & C. 4th 474, 488-89 (Pa. Com. Pl. 2002) ("The court concedes, as defendants argue, that fiduciary relationships are most often found in financial dealings; however, the court believes that the relationship between a nursing home and its residents can be fiduciary in nature.").

portion of the compensatory damages attributed to that claim, which was $5 million, is hereby vacated.

### *E.  Punitive Damages*

The jury returned a punitive damages verdict of $80 million, which, as noted above, was entered against all defendants collectively.  This punitive damages award represents an approximately 7:1 ratio[29] to the $11.5 million compensatory damages award granted by the jury.  Because we have vacated two of the causes of action upon which compensatory damages were awarded, the compensatory damages award has been reduced to $4,594,615.22.[30]  Applying the 7:1 ratio to the reduced amount of compensatory damages results in a punitive damages award of $31,978,521.93.  Accordingly, we will analyze the propriety of the punitive damages award using the figure of approximately $32 million.

MC Companies argue that the punitive damages award must be vacated because the trial court improperly allowed the jury to consider evidence of Manor Care, Inc.'s, wealth despite the absence of evidence warranting punitive damages against Manor

---

[29]The precise ratio is 6.96:1.

[30]*See supra* Section III.C, which dismisses Mr. Douglas' Nursing Home Act claim, and Section III.D, which dismisses Mr. Douglas' claim for breach of fiduciary duty.

Care, Inc.[31] Moreover, MC Companies submit that punitive damages require a substantially

greater showing and are permissible only when the defendant's conduct meets the heightened

standard of "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or

criminal indifference to civil obligations affecting the rights of others." Syl. pt. 4, in part,

*Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895). MC Companies further note that the

circuit court allowed the jury's punitive damages award against Manor Care, Inc., and

permitted consideration of Manor Care, Inc.'s, wealth based upon the court's finding that "all

four Defendants operated the nursing home jointly." However, MC Companies assert that

the record does not support this finding.

Additionally, MC Companies argue that this Court should remit the punitive

damages award because it is unconstitutionally excessive. In this regard, they first contend

that the circuit court improperly considered the existence of insurance and acknowledged that

---

[31]MC Companies additionally reasserts their argument that the trial court failed to ask the jury to determine whether the conduct of each individual defendant was so egregious that it warranted punitive damages against that particular defendant. As noted elsewhere in this opinion, *see supra* Section III.A.2., MC Companies waived this argument. Accordingly, because the defendants were grouped together for the jury's determination of whether punitive damages were warranted and the amount of punitive damages awarded, it is impossible to ascertain which specific defendants were found by the jury to be subject to punitive damages. For this reason, any arguments asserted by MC Companies pertaining to an individual defendant, such as their argument that the evidence was insufficient to warrant punitive damages against Manor Care, Inc., will not be addressed. We simply have no way to know whether the jury assessed punitive damages against any particular entity such as Manor Care, Inc.

40

this improper consideration "weigh[ed] heavily" in its determination that the punitive

damages award was appropriate.[32] MC Companies further complain that the circuit court

commented that "public policy is best served by imposing the punitive damage award intact

because of the presence of punitive damage insurance." Next, they argue that the amount of

punitive damages was grossly disproportionate to the amount of compensatory damages. MC

Companies assert, incorrectly, that the total compensatory damages in this case are $500,000

based upon the MPLA cap. They then argue, also incorrectly, that the ratio in this case is

160:1. MC Companies argue that this Court should allow only a 1:1 ratio. Finally, MC

Companies argue that the amount of punitive damages are grossly disproportionate to civil

penalties for comparable conduct. They assert that the maximum civil penalty under the

NHA for violating the provision governing appropriate staffing in a nursing home is $8,000.

---

[32]On this point, the circuit court stated, in its *Garnes* order:

> At the outset, it should be noted that West Virginia has a long history and well developed precedent regarding punitive damages. *See Punitive Damages Law in West Virginia*, Robin Jean Davis and Louis Palmer, Jr. (2010). This *Perrine* order involves issues of first impression in West Virginia. First, this case involves reprehensible conduct which resulted in the wrongful death of Dorothy Douglas. No case in West Virginia provides a benchmark to measure punitive damages in such context. Second, the entire punitive damage verdict is covered by insurance. *These factors* weigh heavily on the scales of justice when determining whether the $80 million punitive damage award is appropriate under West Virginia law.

(Second emphasis added).

41

*Citing* W. Va. C.S.R. § 64-13-16.9.a. They contend that, similarly, the federal fine for nursing home deficiencies that put residents' health in "immediate jeopardy" is a maximum of $10,000 per day. *Citing* 42 C.F.R. § 488.438(a)(1)(I). MC Companies argue that, accordingly, the maximum federal penalty to which they would have been subject for Ms. Douglas' nineteen-day stay is $190,000.

Mr. Douglas responds that the punitive damages award was clearly justified in this case because the evidence demonstrated that MC Companies' conduct was intentional and demonstrated actual malice and proximately caused the death of Ms. Douglas. The actual malice of MC Companies was demonstrated by the fact that the Heartland Nursing Home was constantly short-staffed, and, therefore, the basic needs of its residents could not be met. In this regard, Ms. Douglas' treating physician testified that she died as a result of dehydration. Further evidence demonstrated that MC Companies attempted to deceive state surveyors regarding their practice of short-staffing the facility. More importantly, according to Mr. Douglas, is the fact that there was ample evidence that MC Companies were aware of these problems yet did nothing to correct them. This knowledge came in the form of complaints from employees and a citation that had been issued to the facility, prior to Ms. Douglas' admission to Heartland Nursing Home, for failing to have adequate staff. Nevertheless, MC Companies failed to increase its staffing budget.

Next, Mr. Douglas argues that the circuit court did not improperly allow the jury to consider evidence of Manor Care, Inc.'s, wealth. He states that, contrary to MC Companies' assertions, the company's wealth was not a "centerpiece of their punitive damages case." Rather, Manor Care, Inc.'s wealth and tax returns were not mentioned until closing arguments.

Finally, Mr. Douglas argues that the punitive damages award was not excessive and does not require remittitur. Mr. Douglas asserts that MC Companies submitted various financial evidence to establish the punitive damage award would effectively wipe out the profit of over 500 of its nursing homes. Therefore, in awarding punitive damages, the trial court properly considered the fact that MC Companies had purchased $125 million in punitive damages liability coverage. Mr. Douglas further clarifies that the punitive damages award represents only a 7:1 ratio when compared to the *actual* compensatory damages awarded in this case. Such a ratio is acceptable in a case such as this where the trial court found MC Companies' conduct to be intentional, reprehensible, self-serving, and financially motivated. Mr. Douglas also contends that, in arguing that the punitive damages should be reduced, MC Companies failed to conduct a complete analysis of the applicable civil or criminal penalties that could be imposed. For example, they fail to consider the death of Ms. Douglas as a result of their conduct.

**1.** **Standard of Review.** We have established the following standard for reviewing punitive damages awards:

> When reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W. Va. 122, 475 S.E.2d 122 (1996), this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.

Syl. pt. 16, *Peters v. Rivers Edge Mining, Inc.*, 224 W. Va. 160, 680 S.E.2d 791 (2009). Furthermore, in reviewing the punitive damages award, all evidence will be viewed in the light most favorable to Mr. Douglas as the prevailing party below:

> "'In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.' Syllabus Point 3, *Walker v. Monongahela Power Co.*, 147 W. Va. 825, 131 S.E.2d 736 (1963)." Syllabus Point 6, *Toler v. Hager*, 205 W. Va. 468, 519 S.E.2d 166 (1999).

Syl. pt. 8, *Smith v. Cross*, 223 W. Va. 422, 675 S.E.2d 898 (2009).

Guided by these standards, we will address the appropriateness of the punitive damages awarded to Mr. Douglas. At the outset, we note that, in recent years, this Court has refined the specific analysis to be applied in conducting our *de novo* review of a punitive damages award. Thus, we have held that

44

[w]hen this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993)].

Syl. pt. 6, *Perrine*, 225 W. Va. 482, 694 S.E.2d 815. Accordingly, we first "evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895), and its progeny." *Perrine*, 225 W. Va. 482, 694 S.E.2d 815.

**2. *Mayer v. Frobe* Analysis.** In *Mayer v. Frobe*, this Court established the types of conduct that could form the basis for an award of punitive damages: "In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. pt. 4, *Mayer*, 40 W. Va. 246, 22 S.E. 58. *See also* Syl. pt. 4, *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 289 S.E.2d 692 (1982) ("'Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like

45

aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong.' Syllabus Point 1, *O'Brien v. Snodgrass*, 123 W. Va. 483, 16 S.E.2d 621 (1941).").

The circuit court concluded that the foregoing standard was met in this case and related the relevant evidence against the defendants collectively[33] as follows:

> The Court finds there is ample evidence to support an award of punitive damages against the HCR Manor Care Defendants. Specifically, the Court notes that the evidence adduced at trial was sufficient for the jury to conclude that:
>
> (a)   Dorothy Douglas was an incapacitated resident of the nursing home operated jointly by the HCR Manor Care Defendants;
>
> (b)   Dorothy Douglas was neglected over a period of 19 days at the nursing home[,] which resulted in her death by dehydration;
>
> (c)   The neglect was perpetrated by the nursing home staff employed by the HCR Manor Care Defendants;
>
> (d)   The HCR Manor Care Defendants were aware that chronic short-staffing of its nursing homes jeopardized the health and safety of its residents;
>
> (e)   The HCR Manor Care Defendants intentionally acted with a disregard to a known risk with the high probability that harm would result from the neglect of incapacitated residents of its nursing home;

---

[33]*See supra* note 31.

(f)     The HCR Manor Care Defendants possessed actual knowledge of its understaffed nursing home and the risks attendant to its conduct; and

(g)     The HCR Manor Care Defendants were placed on notice of neglect in its nursing home by residents, resident families, staff and state regulators but failed to take appropriate action.

Neglect of an incapacitated resident of a nursing home, which results in death by dehydration, over a span of 19 days, is conduct which is sufficient to justify an award of punitive damages under West Virginia law. Moreover, actual knowledge of systemic neglect in a nursing home, over a period of months or years, rises to the level of intentional, wanton, willful and reckless conduct. The HCR Manor Care Defendants engaged in a reckless disregard for the lawful rights of its nursing home residents which resulted in the wrongful death of Dorothy Douglas. The evidence presented at trial is consistent with and justifies an award of punitive damages under the *Mayer* test . . . .

(Footnote omitted).

We agree with the circuit court's conclusion. The evidence presented at trial was sufficient to establish that Heartland Nursing Home was chronically understaffed to the point that it was not able to provide even a life sustaining amount of water to Ms. Douglas during the nineteen days she resided in that facility. Moreover, by virtue of complaints from staff, residents, and their families, and surveys conducted by the State of West Virginia, MC Companies were made aware of the understaffing problem at Heartland Nursing Home in the

47

months preceding Ms. Douglas' admittance to the facility.[34]  Despite their knowledge of the

_____

[34]In this regard, a Statement of Deficiencies issued by the West Virginia Department of Health and Human Services to Heartland Nursing Home prior to Ms. Douglas' residency there declared:

> Based on staff interviews, resident interviews, family interviews and review of the nursing staffing worksheet, the facility failed to consistently deploy sufficient nursing staff across all shifts and units to meet the assessed needs of dependent residents. This was evidenced by reports given by five (5) of five (5) alert and oriented residents, during confidential interviews; seven (7) of seven (7) facility staff during confidential interviews; and a family member of a current resident residing in the facility.  This deficient practice has the potential to affect all residents in the facility. . . .
>
> Findings include:
>
> a) During confidential interviews, staff, residents, and family verbally reported the inability to get even the basic care completed during times when the facility was short-staffed with nursing assistants, most notably on the weekends. . . .
>
> . . . .
>
> Nas [(Nursing assistants)], during confidential interviews reported that, with having only four (4) Nas per floor, it was impossible to do everything they are supposed to do citing that this practice hinders prompt response to call bells, caring for incontinent residents in a timely manner and they noted that tasks like mouth care often did not get done with short staffing.
>
> A family member stated, during a confidential interview, that, on 04/18/09, there were only four (4) NAs working on her family member's floor, which housed seventy (70) residents. She stated she has complained to the facility repeatedly of the problem of too low staffing levels of NAs, but rather than

(continued...)

48

understaffing problem and the risk created thereby, MC Companies failed to increase the

staff at Heartland Nursing Home. Furthermore, and most troublesome, was the evidence that

MC Companies attempted to conceal the fact that Heartland Nursing Home was understaffed

by providing additional staff during times when the facility was being inspected. This

evidence is sufficient to satisfy the *Mayer v. Frobe* standard. Therefore, punitive damages

were justified. We next examine the amount of the punitive damages award pursuant to the

*Garnes* factors.

   **3. Amount of Punitive Damages Award.** In *Perrine*, this Court revisited the

factors set out in *Garnes* and determined that "court review of punitive damages awards

would be simplified if the [*Garnes*] factors were grouped according to their purpose." 225

W. Va. at 553, 694 S.E.2d at 886. Accordingly, the *Perrine* Court restated the *Garnes* test

as follows, without changing the substance of the test:

> When a trial or appellate court reviews an award of
> punitive damages for excessiveness under Syllabus points 3 and
> 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413
> S.E.2d 897 (1991), the court should first determine whether the

---

[34](...continued)
addressing the problem, the NAs were written up.

Alert and oriented residents, during confidential interviews,
stated it was not unusual to have to wait for more than an hour
for help after pushing the call bell and one (1) resident said she
waited so long for help, after pushing the call bell, that she
voided in her bed.

amount of the punitive damages award is justified by aggravating evidence including, but not limited to: (1) the reprehensibility of the defendant's conduct; (2) whether the defendant profited from the wrongful conduct; (3) the financial position of the defendant; (4) the appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed; and (5) the cost of litigation to the plaintiff. The court should then consider whether a reduction in the amount of the punitive damages should be permitted due to mitigating evidence including, but not limited to: (1) whether the punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (2) whether punitive damages bear a reasonable relationship to compensatory damages; (3) the cost of litigation to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence.

Syl. pt. 7, *Perrine*, 225 W. Va. at 553, 694 S.E.2d at 886. Following this holding, we first review the aggravating evidence to ascertain whether the punitive damage award was justified.

**a.** *Garnes* **Aggravating Factors.** The circuit court set out in detail the aggravating evidence that was presented at trial. We will review this evidence in light of each of the *Garnes* aggravating factors.

**(1) The first *Garnes* aggravating factor considers the reprehensibility of**

50

**the defendant's conduct.**  The circuit court concluded that MC Companies' conduct was

reprehensible based upon the following evidence:

> The Court finds that there is sufficient evidence for the jury to conclude the HCR Manor Care Defendants knowingly engaged in an intentional and malicious course of conduct resulting in the neglect of Dorothy Douglas.  Such neglect proximately resulted in her death by dehydration. . . .
>
> The conduct by the HCR Manor Care Defendants is reprehensible because it was not an isolated event.  There was sufficient evidence presented at trial to establish Dorothy Douglas was neglected throughout her 19 day ordeal at Heartland of Charleston [Heartland Nursing Home].  Dorothy Douglas became immobile, fell, suffered significant head trauma, developed sores in her mouth for which the dead tissue had to be scraped away with a scalpel, suffered bruises and sores on her body, and was so depleted of water that she became dehydrated and died.
>
> The conduct by the HCR Manor Care Defendants is reprehensible because the neglect was systemic, repetitive and [a]ffected other residents as well.  The Plaintiff presented evidence of a survey dated April 29, 2009, months before the residency of Dorothy Douglas, conducted by state regulators which cited the West Virginia nursing home for failure to "consistently deploy sufficient nursing staff across all shifts and units to meet the assessed needs of dependent residents."  The survey revealed confidential interviews from staff, residents and family members who "verbally reported the inability to get even the basic care completed during times when the facility was short staffed with nursing assistants most notably on weekends." . . . Mark Wilson, Manor Care Regional Director of Operations (for seven HCR Manor Care nursing homes in West Virginia, including Heartland [Nursing Home]) testified that he was aware of the survey results prior to the admission of Dorothy Douglas and "knew it was a problem.". . .
>
> Furthermore, the Plaintiff adduced evidence at trial

sufficient for a jury to determine the conduct was reprehensible. Specifically, the Court notes the following:

(a)     An HCR Manor Care nursing staff member (Tara Bowles), assigned to attend Dorothy Douglas, described the conditions in the nursing home as "horrible" and "unbearable.". . . She testified that "there is [sic] too many patients for us to take care of by ourselves" and patients would lay in their urine and feces . . . . She admitted that she and the rest of the staff "couldn't take care of the patients the way we should have.". . . She testified: "I wouldn't put my dog there.";

(b)     An HCR Manor Care nursing staff supervisor (Beverly Crawford), who also attended Dorothy Douglas, testified the patients "weren't given the proper care that they deserved.". . . She testified that she reported resident neglect to the HCR Manor Care administrator who "yelled" at her for documenting patient neglect and removed the report from the books. . . . She accused the HCR Manor Care administrator of covering up the incident. . . .

(c)     A registered nurse (Paula Langston) from another facility (Heritage [Center]) testified that she provided care for Dorothy Douglas the morning after she was transferred from HCR Manor Care and that, in her opinion, Dorothy appeared to have been a victim of neglect. . . .

(d)     An HCR Manor Care human resource director (Devon Revels) testified that she complained to regional management about the West Virginia nursing home staff being short-staffed, overworked and underpaid. . . . [T]his work environment cause[d] great[er] than a 100% turnover rate in the nursing department.;

(e)     The HCR Manor Care Defendants actively concealed and covered-up their misconduct prior to the death of Dorothy Douglas. The Plaintiff adduced evidence at trial that the Defendants intentionally altered data and

52

attempted to cover up their systemic staffing problems from West Virginia regulators. This intentional conduct includes: (1) falsifying staffing schedules . . .; (2) intentionally miscalculating nursing hours . . .; (3) destruction of written complaints of neglect . . .; (4) reprimanding employees for documenting neglect . . .; (5) increasing the number of staff during State inspections . . . .; and

(f)     The HCR Manor Care Defendants acknowledged to state regulators, prior to Dorothy Douglas' admission, that the West Virginia nursing home, particularly the second floor, was understaffed approximately 46% of the time [on the weekends]. Dorothy Douglas was a resident of the second floor. [A member of the] nursing staff testified the facility was actually short-staffed 99% of the time. The nursing home administrator testified that he was aware [of] staffing falling below state minimums on occasion. . . . Despite acknowledging the problem, the nursing home was still short-staffed during the residence of Dorothy Douglas.

In *Garnes*, this Court indicated that the reprehensibility consideration

should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

Syl. pt. 3, in part, *Garnes*, 186 W. Va. 656, 413 S.E.2d 897. We agree with the circuit court

that MC Companies' conduct was reprehensible.

**(2) The second *Garnes* aggravating factor is the profitability of the wrongful conduct.** This analysis "requires consideration of whether [the defendants] profited from [their] conduct and instructs that punitive damages should remove the profit, and be in excess of the profit, so as to discourage future bad acts by [the defendants]." *Perrine*, 225 W. Va. at 554, 694 S.E.2d at 887. The circuit court concluded that MC Companies profited from their wrongful conduct. Furthermore, insofar as the punitive damages award should remove the profit so as to discourage future bad acts by MC Companies, the circuit court weighed the fact that MC Companies had $125 million in liability insurance that would cover the punitive damages award. In this regard, the circuit court stated:

> The Court finds there is sufficient evidence adduced at trial for the jury to conclude that the short-staffing of the nursing home was directly related to corporate profits. The Plaintiff presented evidence at trial that staffing is the largest expenditure in the nursing home industry. . . .

The circuit court was persuaded by Devon Revels, a former human resource director at Heartland Nursing Home, who testified that she repeatedly requested authority to hire more agency employees, but her requests were refused. Ms. Revels opined that having agency nursing staff working at the nursing home for approximately one month when a group of new employees was going through orientation would prevent the new employees from becoming overwhelmed by the short-staffing at the facility and would enhance her ability to

retain new employees. She indicated that new employees often resigned before completing their orientation due to the short staffing of the facility.

Relevant to the goal that a punitive damages award should remove the profit gained from wrongful conduct, the circuit court rejected MC Companies' argument that the award would "'effectively wipe[] out' the profit of over 500 HCR Manor Care nursing homes . . . and . . . may bankrupt . . . and destroy the Defendants . . . ." The circuit court reasoned that

> that the HCR Manor Care Defendants purchased $125 million in liability insurance. There is no coverage dispute and no reservation of rights. . . . The insurance policies were submitted of record and the Court takes judicial notice, with no exception taken by the Defendants, that the insurance policies *expressly* provide coverage for punitive damages. . . . So, in reality, this verdict will not "wipe out" the Defendants financially. The only economic cost to the HCR Manor Care Defendants adduced in the post-trial review is a potential, un-quantified increase in future insurance premiums . . . .

(Emphasis added).

We find no error with the circuit court's conclusion that the large punitive damages award in this case is necessary to remove the profitability of MC Companies' wrongful conduct. MC Companies was able to achieve a higher profit by having fewer employees to pay. This profit was achieved at the expense of the residents who were not properly cared for. As a direct result of MC Companies' failure to provide adequate staff,

55

the neglect suffered by Ms. Douglas was so severe she was unable to survive it.  In addition, we reject MC Companies' argument that the existence of punitive damages insurance coverage was an improper consideration for the trial court in assessing the propriety of the punitive damages award.  The existence of punitive damages insurance coverage is relevant to several of the factors used to evaluate a punitive damages award.  Not only does it impact whether the punitive damages remove the profit achieved from the wrongful conduct, but it also bears a relation to the wealth of the defendant and the deterrent effect of the punitive damages award insofar as it reduces the financial burden on the defendant to pay the award.

> **(3)** **The third *Garnes* aggravating factor is the Defendants' financial position.**  In examining this issue, the circuit court explained that

> The HCR Manor Care Defendants assign error to the use of the Manor Care, Inc. tax return and argue, for the first time post-trial, that only Heartland of Charleston's financial information should have been introduced at trial.[35] . . .

> This position is untenable[.] . . .  [D]ue to the HCR Manor Care Defendants' decision to try this matter as a singular entity and to consolidate all of the Defendants in a singular punitive damages award, placing into evidence the financial worth of each Defendant would have been redundant to that encompassed in the consolidated return for Manor Care, Inc.

> The HCR Manor Care Defendants agreed during the jury charge that they wanted all of the Defendants on a single line

---

[35]The [circuit court] takes judicial notice that the financial information for Heartland of Charleston was not produced until post-trial.

[on the verdict form]. Manor Care, Inc.[,] disclosed the 2009 consolidated tax return for [the] trial record[,] which evidences $4,085,072,446.00 in total revenue, total assets of $7,917,892,414.00 and a net profit of $75,263,092.00. HCR Manor Care Regional Director of Operations, Mark Wilson, testified that the HCR Manor Care Defendants employ "nearly 60,000 employees working in over 500 locations nationwide." . . .

The HCR Manor Care Defendants hold a $4 billion share of the annual nursing home market and report nearly $8 billion in assets. The HCR Manor Care Defendants reported a net operating profit of $75 million in 2009 alone. Given the HCR Manor Care Defendants' size and resources, a large punitive damage award is reasonable and required to serve the purpose of punitive damages.

While the wealth of a defendant(s) cannot justify an unconstitutional punitive damages award, the award in this case is not unconstitutional or excessive. Indeed, to accomplish punishment and deterrence for such a wealthy company, a punitive damage award must necessarily be large. *Perrine v. E.I. du Pont de Nemours and Co.*, 225 W. Va. 482, 555, 694 S.E.2d 815, 888 (2010). This is particularly true when the "punishment" aspect of a punitive damage award is offset by the presence of $125 million in punitive damage insurance. This verdict sends a clear "deterrence" message to a multi-billion dollar nursing home corporation that its misconduct will not be tolerated in West Virginia.

We agree with the circuit court's conclusions and find no error in the reliance on Manor Care, Inc.'s, wealth in assessing the propriety of the punitive damages award. Because MC Companies sought to be grouped together with only one line upon which the jury could place the punitive damages award, it was appropriate for the jury to consider the

57

wealth of all of the defendants. Insofar as MC Companies is a multi-billion dollar entity with $125 million in punitive damages insurance coverage, the approximately $32 million dollar punitive damages award is justified.

**(4) The fourth aggravating factor in the *Garnes* analysis is whether the punitive damages award will encourage fair and reasonable settlements.** This Court has explained that

> [t]he focus of the reviewing court's consideration of whether the punitive damages award would encourage fair and reasonable settlements is on the impact it is likely to have on future litigants. That is, was the award large enough so that a future defendant who has committed a clear wrong will be encouraged to accept a fair and reasonable settlement rather than force the wronged plaintiff into litigation and risk incurring a similarly large punitive damages award.

*Perrine*, 225 W. Va. at 556, 694 S.E.2d at 889. In its discussion of this factor, the circuit court stated:

> The parties proffered various versions of the settlement negotiations during the instant matter. The record indicates the HCR Manor Care Defendants offered to settle this wrongful death claim for $150,000 at mediation and raised its offer to $500,000 sometime before trial. The record also reflects the HCR Manor Care Defendants have spent over $1.1 million in litigation defenses. . . .
>
> The documents submitted to the Court indicate the HCR Manor Care defendants spent nearly $10 million defending $13 million in claims. The record reveals the Defendants are willing to spend as much money defending claims as settling claims. Such a business decision does not evidence a willingness to

settle claims when a clear wrong has been done. In fact, spending $10 million defending $13 million in claims evidences the opposite; to wit, the HCR Manor Care Defendants will spend nearly as much money defending claims as settling claims, even though a clear wrong has been done.

The Court finds that this punitive damage award will *encourage* the HCR Manor Care Defendants to reconsider its defense tactics of deny and defend when a clear wrong has been committed.

We agree with the circuit court that the amount of the punitive damages awarded in this case is likely to encourage MC Companies and other similar large corporations to resolve similar disputes through settlement rather than litigation when, as in this case, a clear wrong has been committed.

**(5)     The final *Garnes* aggravating factor is the cost of the litigation to the plaintiff.** The circuit court found that

[t]he Plaintiff expended in excess of $200,000 in litigation costs and devoted countless hours of attorney time to bring this case to trial. Prosecuting this case requires a plaintiff to retain a lawyer capable of financing the litigation costs on a contingency fee contract. Otherwise, very few West Virginians could afford to bring the HCR Manor Care Defendants to justice for the neglect and wrongful death of a family member. It should be noted that the cost of bringing this case to trial exceeded the last offer made by the HCR Manor Care Defendants at mediation. The cost of litigation to the Plaintiff justifies this award of punitive damages.

We agree with the circuit court that the high cost of this litigation to Mr. Douglas supports the amount of punitive damages awarded in this case.

Because each of the aggravating factors supports the punitive damages award, we next engage in a ratio determination under *TXO Production Corp. v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992).

**b. Excessiveness of Punitive Damages Award.** The next step in our analysis is to compare the punitive damages award to the compensatory damages award to determine whether the punitive damages bear a reasonable relationship to the compensatory damages. The circuit court concluded that the ratio was not excessive in this case. As discussed more fully below, West Virginia has recognized that a ratio of roughly 5:1 is constitutional. *See* Syl. pt. 15, *TXO*, 187 W. Va. 457, 419 S.E.2d 870. Moreover, the federal government has indicated that a single-digit ratio is more likely to comport with federal due process. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524, 155 L. Ed. 2d 585 (2003) ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution."). We agree with the circuit court that the 7:1 ratio in this case passes constitutional muster.

In *TXO*, this Court explained that "[a]lthough there is no mechanical

mathematical formula to use in all punitive damages cases, we think it appropriate here to offer some *broad, general guidelines* concerning whether punitive damages bear a reasonable relationship to actual damages." *TXO*, 187 W. Va. at 474, 419 S.E.2d at 887 (emphasis added).[36] Thus, we held that

> [t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is *roughly* 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional.

Syl. pt. 15, *TXO*, 187 W. Va. 457, 419 S.E.2d 870 (emphasis added). Similarly, the United States Supreme Court has commented that

> [w]e decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1. . . ., or, in this case, of 145 to 1.
>
>  . . . [B]ecause there are no rigid benchmarks that a punitive

---

[36]In *TXO*, a punitive damages award of $10,000,000 and a compensatory damages award of $19,000, which equals a ratio of 526:1, was approved where the defendant "knowingly and intentionally brought a frivolous declaratory judgment action" against various businesses and individuals to "clear a purported cloud on a title" when "TXO's real intent . . . was to reduce royalty payments under" an oil and gas lease. *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W. Va. 457, 462, 419 S.E.2d 870, 875 (1992), *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993).

61

damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.

*Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524, 155 L. Ed. 2d 585 (internal quotations and

citation omitted).

Notably, the 5:1 ratio mentioned in Syllabus pont 15 of *TXO*, as well as the

ratio statements by the United States Supreme Court, do not represent strict standards.

Instead, they merely provide a guide.[37]  As one court has observed:

[S]tatements by the Supreme Court discuss ratios with specific reference to the amount of compensatory damages awarded.  As noted above, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards," *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602; and conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524.  Consistent with the Supreme Court's refusal to establish rigid benchmarks, *these statements provide guidance rather than a specific mandate—i.e.*, in the same way that low compensatory awards "may" justify higher ratios, smaller ratios "can" reach the outermost limits of due process when the compensatory award is substantial.  In other words, *it appears that low compensatory awards may, but do not necessarily, justify higher ratios; and in*

---

[37]In fact, the award granted in *TXO* amounted to a 526:1 ratio.  *See TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W. Va. 457, 419 S.E.2d 870.

*the same way, substantial compensatory awards may, but do not
necessarily, require lower ratios.*

*Seltzer v. Morton*, 336 Mont. 225, 294-95, 154 P.3d 561, 610-11 (2007) (emphasis added)

(footnotes omitted).  Even the *Campbell* Court's observation that "[s]ingle-digit multipliers

are more likely to comport with due process, while still achieving the State's deterrence and

retribution goals," does not proclaim an iron clad rule.  *Campbell*, 538 U.S. at 410, 123 S. Ct.

at 1516, 155 L. Ed. 2d 585.  Indeed, although the Supreme Court suggested in *Campbell* that

a ratio at or near 1:1 may be appropriate in that instance, on remand the Supreme Court of

Utah ultimately granted an award with a ratio of approximately 9:1.  *See Campbell v. State*

*Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 413 (Utah 2004) (awarding punitive damages of

$9,018,780.75 and compensatory damages of $1 million), *cert. denied,* 543 U.S. 874, 125

S. Ct. 114, 160 L. Ed. 2d 123 (2004).[38]  Thus,  while "[s]ingle-digit multipliers *are more*

---

[38]In reaching its decision, the Supreme Court of Utah recognized the United
States Supreme Court's reluctance to establish a national standard for reprehensibility, and
commented that

> [j]ust as behavior may be unlawful or tortious in one state
> and not in another, the degree of blameworthiness assigned to
> conduct may also differ among the states.  As long as the
> Supreme Court stands by its view that punitive damages serve
> a legitimate means to satisfy a state's objectives to punish and
> deter behavior which it deems unlawful or tortious based on its
> own values and traditions, it would seemingly be bound to avoid
> creating and imposing on the states a nationwide code of
> personal and corporate behavior.

In this instance, we find the blameworthiness of State

(continued...)

*likely* to comport with due process," *Campbell*, 538 U.S. at 410, 123 S. Ct. at 1516, 155 L. Ed. 2d 585 (emphasis added), higher ratios, even double or triple digit ratios, are not *per se* unconstitutional. *See, e.g.*, *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (upholding 526:1 ratio of punitive damages to compensatory damages), *aff'd*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366; *Williams v. Philip Morris Inc.*, 344 Or. 45, 176 P.3d 1255 (2008) (affirming award with ratio of 159:1 following remand from United States Supreme Court), *cert. dismissed*, 556 U.S. 178, 129 S. Ct. 1436, 173 L. Ed. 2d 346 (2009) (per curiam). *See also, e.g.*, *Eastern Prop. Dev. LLC v. Gill*, No. 13-10219, 2014 WL 868613 (11th Cir. Mar. 6, 2014) (affirming punitive damages award with 7:1 ratio); *Saunders v. Branch Banking & Trust Co. of Virginia*, 526 F.3d 142 (4th Cir. 2008) (affirming punitive damages award with 80:1 ratio); *Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257 (10th Cir. 2006) (affirming punitive damages award with 20:1 ratio); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) (affirming punitive damages award with 37:1 ratio); *Hazard Nursing Home, Inc. v. Ambrose*, No. 2012-CA-000636-MR, 2013 WL

---

[38](...continued)
Farm's behavior toward the Campbells to be several degrees more offensive than the Supreme Court's less than condemnatory view that State Farm's behavior "merits no praise." *Id*. at 419, 123 S. Ct. 1513. We reach this conclusion after applying the relevant reprehensibility standards to the facts approved for consideration of State Farm's reprehensibility in *Campbell II*, and in light of Utah's values and traditions.

*Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 413 (Utah 2004).

3808018 (Ky. Ct. App. July 19, 2013) (affirming punitive damages award with 7.5:1 ratio); *Miller v. Levering Reg'l Health Care Ctr., LLC*, 202 S.W.3d 614 (Mo. Ct. App. 2006) (affirming punitive damages award with 24:1 ratio); *Coalson v. Canchola*, 287 Va. 242, 754 S.E.2d 525 (2014) (reversing lower court's remittitur and reinstating jury's award with 18:1 ratio).

While the foregoing cases are not factually comparable to the instant matter, they nevertheless serve as instructive examples of cases wherein courts have found high ratios to be justified and within constitutional limits – even ratios as high as 152:1 or 526:1! While a large compensatory award, such as the one in this case, may typically be expected to result in a ratio closer to the range of 1:1, this is not always the case. *See, e.g.*, *Aleo v. ALB Toys USA, Inc*., 466 Mass. 398, 995 N.E.2d 740 (2013) (affirming punitive damages award with 6.8:1 ratio, $2.6 million in compensatory damages and $18 million in punitive damages, in action alleging negligence, breach of implied warranty, and wrongful death arising from woman's death from injuries sustained trying to use inflatable swimming pool slide); *Horizon/CMS Healthcare Corp. v. Auld*, 43 Tex. Sup. Ct. J. 1151, 34 S.W.3d 887 (2000) (affirming punitive damages award with 6.15:1 ratio, $1.54 million in compensatory damages and $9.48 million in punitive damages, in case involving claims of negligence and gross negligence, not resulting in death, against a nursing home).

What may be gleaned from the forgoing cases is that punitive to compensatory damages ratios must be examined on a case-by-case basis. *See*, *e.g.*, *Ewing v. California*, 538 U.S. 11, 34, 123 S. Ct. 1179, 1192, 155 L. Ed. 2d 108 (2003) (commenting that "the Due Process Clause directs judges to employ proportionality review in assessing the constitutionality of punitive damages awards on a case-by-case basis"); *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524, 155 L. Ed. 2d 585 ("The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."); *TXO*, 509 U.S. at 458, 113 S. Ct. at 2720, 125 L. Ed. 2d 366 ("'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.'" (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S. Ct. 1032, 1043, 113 L. Ed. 2d 1 (1991))); *Peters v. Rivers Edge Mining, Inc*., 224 W. Va. 160, 194, 680 S.E.2d 791, 825 ("'[T]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" (quoting *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524, 155 L. Ed. 2d 585)).[39]  Accordingly, we now hold that whether the ratio of

---

[39]*See also, e.g.*, *Trickey v. Kaman Indus. Techs. Corp*., 705 F.3d 788, 800 (8th Cir. 2013) ("[P]unitive damages awards are evaluated on a case-by-case basis."); *Riffey v. CRST Expedited, Inc*., No. 3:12–CV–00294–BRW, 2013 WL 6836665, at *2, (E.D. Ark. Dec. 20, 2013) ("[P]unitive damages must be determined on a case-by-case basis."); *Cooley v. Lincoln Elec. Co.*, 776 F. Supp. 2d 511, 555 (N.D. Ohio 2011) (commenting that "the Supreme Court has stated clearly that: (1) due process review of punitive damages awards is a fact-specific, case-by-case inquiry—there are no rigid benchmarks that a punitive damages award may not surpass" (quotations omitted)); *Holmes v. Kansas City Missouri Bd.*
(continued...)

punitive damages to compensatory damages is constitutional must be examined on a case-by-case basis.

As the Ninth Circuit has aptly stated: "[W]e emphasize that where the constitutional limit lies with respect to punitive damages will vary from case to case. Determining that limit is an art, not a science; no mathematical formula controls; no single asymptote defines the limit for all cases." *Southern Union Co. v. Irvin*, 563 F.3d 788, 792 (9th Cir. 2009). *See also Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013) (observing that the United State Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), "repeatedly stressed the impossibility of making any bright-line test as the propriety of the ratio can vary enormously with the particular facts of the case").

A ratio that may be unconstitutionally large in one case may be reasonable in another. In this regard, we stated in *TXO* that

> [t]he appropriateness of [punitive damages] awards depends on what it reasonably takes to attract the defendant's attention because, as we said in *Garnes*, an award that might be

---

[39](...continued)
*of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. Ct. App. 2012) ("[P]unitive damages awards are evaluated on a case-by-case basis."); *Baldwin v. McConnell*, 273 Va. 650, 658, 643 S.E.2d 703, 707 (2007) ("[A] reviewing court must consider the reasonableness of punitive damages on a case-by-case basis, considering the relevant circumstances in each particular case.").

> unreasonable if awarded against Jeff's Neighborhood Hot Dog
> Stand could be quite reasonable if awarded for the same conduct
> against McDonald's. *See Garnes*, 186 W. Va. at 670, 413
> S.E.2d at 910.

187 W. Va. at 476, 419 S.E.2d at 889.

Thus, in determining the propriety of the ratio in the instant case, we must

consider the particular facts involved, and we will view those facts in the context of the

purpose of punitive damages:

> "[P]unitive damages serve several purposes. Among the
> primary ones are: (1) to punish the defendant; (2) to deter others
> from pursuing a similar course; and, (3) to provide additional
> compensation for the egregious conduct to which the plaintiff
> has been subjected." . . . Furthermore, "'[[p]unitive damages]
> encourage a plaintiff to bring an action where he might be
> discouraged by the cost of the action or by the inconvenience of
> a criminal proceeding. . . . [They also] provide a substitute for
> personal revenge by the wronged party.'"

*Coleman v. Sopher*, 201 W. Va. 588, 603 n.22, 499 S.E.2d 592, 607 n.22 (1997) (quoting

*Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 691 n.17 & accompanying text,

289 S.E.2d 692, 702 n.17 & accompanying text (1982)). *See also Exxon Shipping Co. v.*

*Baker*, 554 U.S. 471, 492, 128 S. Ct. 2605, 2621, 171 L. Ed. 2d 570 (2008) ("[T]he

consensus today is that punitives are aimed not at compensation but principally at retribution

and deterring harmful conduct."); *BMW of No. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116

S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996) ("Punitive damages may properly be imposed

to further a State's legitimate interests in punishing unlawful conduct and deterring its

repetition.").

We find that, under the unique circumstances presented herein, the punitive damages award of approximately $32 million, which amounts to about a 7:1 ratio when compared to the amount of compensatory damages we have allowed in this opinion, is justified and does not violate due process. In the face of numerous complaints of understaffing made by residents of Heartland Nursing Home, their families, and employees of Heartland, as well as negative results of surveys performed by the State of West Virginia, MC Companies refused to authorize the use of additional employees to ensure a staff sufficient to meet even the basic life-sustaining needs of its residents, who are among the most vulnerable and helpless citizens of West Virginia. MC Companies' refusal to ensure that there was sufficient staff at Heartland Nursing Home to properly care for the needs of its residents, by either increasing staff or reducing the number of residents, implies that corporate profit was emphasized over the needs of residents.

> *Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability*, as of course does willful or malicious action, taken with a purpose to injure. *See* 4 [Restatement (Second) of Torts] § 908, Comment e, p. 466 (1977) ("In determining the amount of punitive damages, . . . the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer . . . .").

*Exxon Shipping Co. v. Baker*, 554 U.S. at 493-94, 128 S. Ct. at 2621-22, 171 L. Ed. 2d 570.

Instead of properly addressing the chronic understaffing of Heartland Nursing Home, MC

Companies attempted to conceal the same by creating the appearance of adequate staff during times when the facility was being inspected, and by allowing its posted staffing data to incorrectly reflect higher levels of staff than were actually working.[40]  Specifically demonstrated by the facts of this case, MC Companies' conduct inflicted egregious physical harm upon a weak and helpless woman who depended upon them for her care: egregious physical harm that ultimately cost this helpless woman her life.  Furthermore, MC Companies' wealth and the existence of $125 million in punitive damages insurance coverage demand a high punitive damages award to attract the attention of this corporate conglomerate, discourage future similar conduct, and encourage it to settle future cases for a reasonable amount when it is clear that a wrong has been committed.  Because we find the punitive damages ratio in this case does not offend due process, we next conclude our review of the punitive damages award by considering whether any mitigating factor  warrants their reduction.

      **c.  *Garnes* Mitigating Factors.**  We review mitigating factors because "[a] punitive damages award that is not constitutionally excessive under *TXO Production Corp.*

---

[40]The record in this regard established that the facility was required by law to post the total number and actual hours of certain nursing staff responsible for resident care. The West Virginia Department of Health and Human Services instead found, during its survey of the Heartland Nursing Home facility prior to Ms. Douglas' residence there, that "the facility failed to post accurate and complete information on a daily basis to reflect the number of direct care staff actually working in the facility, as well as the number of residents in the building, at the beginning of each shift."

*v. Alliance Resources Corp.*, 187 W. Va. 457, 419 S.E.2d 870 (1992), may nevertheless be reduced by a reviewing court when, in the discretion of the court, a reduction is warranted by mitigating evidence." Syl. pt. 8, *Perrine*, 225 W. Va. 482, 694 S.E.2d 815. Thus, we note that

> [t]he *Garnes* mitigating factors include, but are not limited to: (1) whether punitive damages bear a reasonable relationship to compensatory damages; (2) whether punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (3) the cost of litigation to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence.

*Perrine*, 225 W. Va. at 558, 694 S.E.2d at 891. The circuit court found that none of these factors warranted reducing the punitive damages award in this case. We agree.

Addressing the first factor, the reasonableness of the relationship between punitive and compensatory damages, the circuit court found that the single digit punitive damages multiplier, which approximates 7:1, bears a reasonable relationship to the compensatory damages. Although the compensatory damages award in this case is high, we find the punitive damages are nevertheless reasonable in this instance. MC Companies' conduct caused Ms. Douglas to endure a lingering death from dehydration as a consequence of neglect that resulted from the understaffing of the Heartland Nursing Home facility.

71

Despite being made aware of the chronic understaffing at Heartland Nursing Home by various sources, including their own employees and the State of West Virginia, MC Companies refused to ensure the presence of a sufficient number staff to meet the basic life-sustaining needs of its vulnerable, and sometimes helpless, residents. Even worse, MC Companies attempted to conceal the understaffing from state officials conducting surveys of their facility. Moreover, due to the wealth of MC Companies and their punitive damages insurance coverage of $125 million, the large punitive damages award is necessary to achieve the purposes of punitive damages, including, but not limited to, attracting the attention of MC Companies, discouraging them from future similar conduct, and encouraging them to settle future cases for a reasonable amount when a clear wrong has been committed. Because the punitive damages award bears a reasonable relationship to the compensatory damages, this factor fails to provide grounds for reducing the award.

In addressing the second factor, whether punitive damages bear a reasonable relationship to the harm of the defendants' conduct, the circuit court found that

> [n]eglect of an incapacitated resident in a nursing home is a grievous harm. . . .
>
> The "harm" to Dorothy Douglas was death by dehydration. It could be said there is no greater harm than the cost of a life. In this instance, the harm that is likely to occur as a result of systemic neglect of an incapacitated nursing home resident is grievous and merits a substantial punitive damage award.

72

Many nursing home residents, like Dorothy Douglas, are incapacitated and unable to perform basic life functions such as feeding, bathing and toileting. This is the very reason families sometimes entrust an incapacitated family member to a nursing home facility. Chronic short-staffing results in neglect. Neglect of an incapacitated nursing home resident can lead to death. In the case of Dorothy Douglas, the conduct by the Defendants resulted in death by dehydration.

. . . Certainly, the death of Dorothy Douglas occurred under horrendous circumstances. The Court considers death by dehydration a cruel act of injustice. . . .

As to the third, fourth, and fifth factors, the circuit court made the following findings: MC Companies presented evidence to the circuit court that it spent approximately $1.1 million to defend this matter; no criminal sanctions have been imposed on MC Companies; and MC Companies failed to establish that they have been the defendant in any other civil actions arising from the same conduct. Likewise the circuit court found no relevant mitigating information that was not available to the jury and no additional relevant evidence.

We already have reduced the punitive damages award from $80 million to approximately $32 million. Based upon our review of the forgoing mitigating factors, we find no grounds to warrant any further reduction.

**d. Remittitur.** As noted at the outset of our analysis of the punitive damages

73

award, we applied the nearly 7:1 ratio, which was calculated based upon the jury's actual award of compensatory and punitive damages, to calculate a new punitive damages amount based upon the compensatory damages remaining after we vacated two of Mr. Douglas' causes of action. That is, applying the approximate 7:1 ratio to the $4,594,615.22 compensatory award that remains standing, we have granted remittitur and reduced the punitive damages award from $80 million to $31,978,521.93 (a difference of $48,021,478.07). *See Perrine*, 225 W. Va. at 560, 694 S.E.2d at 893 ("The method of granting such a reduction is by remittitur.").

In *Perrine*, we explained that

> "[t]he historic rationale for remittitur practice is that it saves the time and expense of a new trial if the plaintiff will accept a lesser sum as a verdict. The plaintiff is satisfied because the expense of a new trial is avoided, and the defendant is satisfied because he or she either obtains a new trial, or has had the verdict against him or her reduced. Thus this procedure generally has the effect of facilitating settlement, thereby enhancing judicial economy."

225 W. Va. at 560, 694 S.E.2d at 893 (quoting *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 127 N.M. 1, 6, 976 P.2d 1, 6 (1998)). We also made clear that, "[w]hen a court grants a remittitur, the plaintiff must be given the option of either accepting the reduction in the verdict or electing a new trial." Syl. pt. 9, *Perrine*, 225 W. Va. 482, 694 S.E.2d 815. Accordingly, we reverse the punitive damages award and remand with instructions to the circuit court to give Mr. Douglas a period of thirty days from the date the

mandate for this opinion is issued to advise the circuit court whether he will accept remittitur in the amount of $48,021,478.07, which would reduce the punitive damages award to $31,978,521.93, or submit to a new trial on punitive damages only. *See* Syl. pt. 3, in part, *Gebhardt v. Smith*, 187 W. Va. 515, 420 S.E.2d 275 (1992) (per curiam) ("'Rule 59(a), [West Virginia Rules of Civil Procedure], provides that a new trial may be granted to any of the parties on all or part of the issues, and in a case where the question of liability has been resolved in favor of the plaintiff leaving only the issue of damages, the verdict of the jury may be set aside and a new trial granted on the single issue of damages.' Syl. pt. 4, *Richmond v. Campbell*, 148 W. Va. 595, 136 S.E.2d 877 (1964).").

## IV.

## CONCLUSION

For the reasons explained in the body of this opinion, the April 10, 2013, order of the circuit court of Kanawha County denying the defendant's motion for judgment as a matter of law, a new trial, or remittitur is affirmed as to its rulings that MC Companies waived the issue of whether the verdict form disregarded the distinct corporate forms of the defendants, that the verdict form did not allow the jury to award damages to non-parties, and that the MPLA did not provide the exclusive remedy for the asserted negligence claims. The order is reversed based upon our finding that the NHA claim is governed by the MPLA, and, due to a lack of evidence that the pre-suit requirements of the MPLA were met, the NHA

75

claim is dismissed, and the accompanying $1.5 million award is vacated. In addition, the circuit court's order is reversed insofar as it recognized a breach of fiduciary duty claim against a nursing home. The breach of fiduciary duty claim is, therefore, dismissed, and the accompanying $5 million award also is vacated. Finally, we reverse the punitive damages award and remand with instructions to the circuit court to give Mr. Douglas a period of thirty days from the date the mandate for this opinion is issued to advise the circuit court whether he will accept remittitur in the amount of $48,021,478.07, which would reduce the punitive damages award to $31,978,521.93, or submit to a new trial on punitive damages only.

Affirmed, in part; Reversed, in part; and Remanded.